(No. 65249.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DENNIS WILLIAMS, Appellant.

*Opinion filed October 17, 1991.—Rehearing denied March 30, 1992.*

194

CLARK, J., concurring.

Charles L. Glick and Martha J. Burns, of Chicago, and Scott R. Shepherd, of Philadelphia, Pennsylvania, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Cecil A. Partee, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb, Assistant State's Attorney, and Maureen A. Harton, Special Assistant State's Attorney, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Dennis Williams, was convicted of murder, aggravated kidnapping, and rape. Defendant

was sentenced to death for the murders and to concurrent extended terms of 60 years for each of the remaining offenses. We affirmed over defendant's contention, *inter alia*, that he had been denied the effective assistance of counsel. During the pendency of defendant's petition for rehearing, this court became aware of matters relevant to the claimed ineffective assistance of counsel. We allowed defendant's petition for rehearing, and determined that the interests of justice required the granting of a new trial. *People v. Williams* (1982), 93 Ill. 2d 309.

Following a second jury trial in the circuit court of Cook County, defendant was convicted of two counts of murder, one count of rape, and two counts of aggravated kidnapping. Defendant waived jury sentencing and was sentenced by the trial court to death and concurrent terms of 30 years. The death sentence was stayed (134 Ill. 2d R. 609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603). For reasons which follow, we affirm.

Defendant raises numerous issues on appeal. We will address each, in turn.

## FACTUAL BACKGROUND

On Thursday, May 11, 1978, at 12 a.m., Larry Lionberg began his job as an attendant at a Clark Oil service station, at 180th Street and Halsted, in Homewood, Illinois. Sometime after Lionberg began his work-shift, his fiancee, Carol Schmal, joined him at the station. Sometime during the early morning hours, Peter Wonder and Sharon Macciaro, friends of both Lionberg and Schmal, visited the station for approximately 25 or 30 minutes. According to Macciaro, she and Wonder left at about 2:15 a.m.

At about 6:30 a.m., Clemente Morales, the manager of the Clark service station, drove past it and noticed that no one was on duty. Morales investigated and dis-

covered that the station was in disarray and Lionberg was missing. Morales immediately called police.

On the following day, Lionberg's body was found in a grassy area near Deer Creek, in East Chicago Heights. Lionberg had been shot twice in the back of the head, once in the back, and was found laying face down. Schmal's body was discovered on the second floor of a nearby abandoned building located at 1528 Cannon Lane. Schmal was found laying face down, wearing a blouse and knee socks. Her pants and panties had been removed and were found lying beside her. She had been shot twice in the back of the head.

Later that day, police arrested defendant and Verneal Jimerson near the crime scene. The arrest was based upon a tip provided by an unidentified informant, later revealed to be Charles McCraney. Police subsequently took Kenny Adams and Willie Rainge into custody as well. Jimerson, Adams, and Rainge, however, were later released that evening, but defendant remained in custody.

The following day, McCraney went to the Homewood sheriff's police station. After speaking with McCraney, police officers went to the home of Paula Gray and spoke with her. That evening, Gray and her family went to the police station where Gray was interviewed at length in the presence of her mother. Once again, police took Jimerson, Adams and Rainge into custody.

Gray subsequently testified before the Cook County grand jury, implicating defendant, Jimerson, Willie Rainge and her boyfriend, Kenny Adams, in the crimes. According to Gray's grand jury testimony, she had been present in the abandoned building when Schmal had been successively raped by defendant, Adams, Jimerson, and Rainge, made to lie on her stomach, and shot twice in the back of the head by defendant. Gray testified that she had also been present at the grassy area near the

creek when Lionberg was made to lie on his stomach, shot twice in the back of the head by defendant and once in the back by Rainge. According to Gray, defendant subsequently threw the gun used to kill both Schmal and Lionberg into the creek. Gray further testified that defendant had threatened to kill her and her family if she told the police. On both the nights preceding and following her grand jury appearance, Gray stayed at motels in police protective custody allegedly at the request of her mother.

When Gray later returned to her home, she discovered that her family had moved into defendant's mother's home. Two days later, on May 19, 1978, Gray was examined in the emergency room of St. James Hospital because she was exhibiting "bizarre" behavior. The following day, Gray was examined by Dr. Robert Watkins, a family practitioner, in his private offices. On May 21, 1978, she was again examined by Dr. Watkins, who admitted her to St. James Hospital where she remained for two days until discharge.

At some point after discovering that her family had moved into defendant's mother's home, Gray, herself, moved into the home and resided there with her family throughout the summer. During this period, Gray was called by defendant's counsel, Archie Weston, to testify at defendant's preliminary hearing. At the hearing, Gray recanted her entire grand jury testimony. She either failed to respond to questioning or simply repeated, when referred by defense counsel to each of her previous statements before the grand jury, "[T]hat is a lie," "[I] don't know nothing," or "[I] didn't see nothing." Defendant, Adams, and Rainge were subsequently charged by information with murder, rape, and aggravated kidnapping.

Shortly thereafter, Gray was indicted for her participation in the crimes, and for perjury. She was subse-

quently arrested and taken into custody. At a suppression hearing in her own case in October 1978, Gray repeated her recantation. Gray was tried simultaneously with defendant, Adams, and Rainge, although a separate jury was empaneled to hear Gray's case. Attorney Weston, defendant and Rainge's defense counsel represented Gray, following her indictment, at every hearing wherein she recanted her grand jury testimony (her suppression hearing and trial, defendant's first trial and sentencing hearing), although neither Gray nor her family hired him.

At her trial, Gray claimed that the authorities had forced her to lie before the grand jury and continued to flatly deny that defendant, Adams, and Rainge raped Schmal. Defendant, Adams, Rainge and Gray were subsequently convicted of murder, rape and aggravated kidnapping. Gray was also convicted of perjury.

Defendant successfully appealed his conviction and death sentence and was granted a new trial. (See *People v. Williams*, 93 Ill. 2d 309.) Gray served 6 years of a 50-year term before an appeal resulted in the granting of a new trial. (*United States ex rel. Gray v. Director, Department of Corrections* (7th Cir. 1983), 721 F.2d 586.) At the time of Gray's testimony at defendant's second trial, her new trial remained pending. Following defendant's second trial, Gray pleaded guilty to perjury and was sentenced to two years' probation. All other charges against her were dropped.

## TRIAL

### McCraney's Testimony

McCraney testified that during the early morning hours of Thursday, May 11, 1978, he was in the living room of his home, a second-story townhouse apartment, located at 1533 Hammond Lane, in East Chicago

Heights (fairly five miles or more on thoroughfares from the Clark service station). McCraney, a jazz musician, was playing his guitar and composing a song. The front of McCraney's apartment faced a courtyard and the back faced Hammond Lane. Throughout the evening, McCraney would periodically interrupt his playing to go upstairs and look through a back bedroom window to check on his two newly upgraded autos parked below on Hammond Lane.

McCraney testified that at about 3 a.m., he' looked through a back bedroom window and saw two cars, a blue Chevrolet and a beige Toyota parked outside. Several persons, including Paula Gray, Kenny Adams, and Verneal Jimerson, were sitting in the cars, walking about, and playing music. Adams was the driver of the beige Toyota, and Gray sat in his car as well as in a blue Chevrolet. During the two weeks that McCraney had lived there, these activities had occurred every night and it was not unusual for these various individuals to come and go many times from the vicinity during the day and evening. After looking out the window, McCraney went downstairs to the living room and resumed his guitar-playing.

After about 13 to 15 minutes, he returned to the upstairs bedroom window and again looked outside. This time, he saw a red Toyota backing up beside the beige Toyota. McCraney's sighting of this red Toyota was not unusual, however, because it had appeared daily near 1528 Hammond Lane during the two weeks that McCraney and his family had lived in the apartment. In fact, by McCraney's estimate, since 9 p.m., that evening, when he began looking out the upstairs window, the red Toyota had driven to and departed from the parking area several times. Seeing nothing unusual, McCraney once again returned to his living room and resumed playing.

Within 10 to 15 minutes, however, McCraney, was again at the upstairs window because he felt that "something wasn't right" since the cars had "backed in." In addition to the other parked cars, McCraney now saw a yellow Vega backing near the red Toyota. McCraney observed the driver of the Vega speak with the driver of the red Toyota while both remained in their vehicles. The driver of the red Toyota, identified by McCraney at trial as defendant, then started his car and drove it under a nearby street light. He exited his vehicle, picked up a stone, threw it, and broke the light. Defendant then re-entered the red Toyota and backed it into the same space from which he had previously driven it.

When McCraney saw defendant break the light, he became nervous and continued to watch. He saw the driver of the yellow Vega, later identified as codefendant Willie Rainge, exit the Vega and enter the red Toyota. Defendant and Rainge then drove off in the red Toyota, headed east on Hammond Lane. Thinking that perhaps someone was preparing to or had already tampered with his car, McCraney went outside to check it. Finding nothing wrong, however, McCraney returned to his living room and continued playing his guitar.

Shortly after McCraney resumed playing, however, he heard a car engine strongly "revving," so he went upstairs to the front bedroom window which looked out onto the courtyard area. McCraney saw the red Toyota stalled in mud and "gunning" its engine. McCraney testified that this viewing of the Toyota occurred not longer than three minutes after the auto had departed from the rear of his apartment heading east on Hammond Lane. At this point, McCraney also heard people running, so he rushed to the back bedroom window. There, he saw a group of people getting out of cars, running towards the courtyard area located at the front of his apartment. Mc-

Craney testified that he remembered seeing Kenny Adams among these individuals.

Once the group rushed to the middle of the courtyard, McCraney saw them gather around and push the red Toyota until it moved forward to a position near the doorway of an abandoned building located at 1528 Cannon Lane. The group, comprised of six to eight persons, then rushed into the building. McCraney was able to clearly identify defendant, Rainge, and Adams, but not the other individuals, within the group. McCraney was not able to tell whether the group included any white persons or women. Under cross-examination, McCraney acknowledged that he did not see Paula Gray or Verneal Jimerson enter the building.

After the group entered the building, McCraney returned to his rehearsal and did not continue looking outside. After rehearsing for about 1½ hours, McCraney heard a single echoing gunshot that came from the courtyard area in front of his apartment. He did not stop playing, however, since gunshots were not unusual during the night in that area.

On Friday, May 12, 1978, when Lionberg's body was found, McCraney stood within a crowd of spectators gathered near his apartment building. The crowd watched as police investigated the crime scene. McCraney testified that, while standing there, he overheard defendant, also in the crowd, jokingly say to other onlookers, "[D]id you shoot those people? [D]id you shoot those people? *** [Y]ou should have seen them jump." According to McCraney, when defendant made these remarks, only Lionberg's body had been discovered. McCraney subsequently acknowledged, however, that at that time, he was aware that two persons were missing.

When McCraney learned that Schmal's body had been discovered in the abandoned building, he reflected upon

the events of the earlier morning, went to a nearby gas station and called police.

McCraney told police, "[T]he people that committed the crimes is on the scene now of the crime. *** I might come forward if these people are picked up." McCraney described a beige and a red Toyota, and his own whereabouts to police. He did not, however, identify himself because, as he testified, he was concerned about the safety of his family. After calling, McCraney returned home.

The next day, McCraney went to the Homewood police station and spoke at length with police and identified two vehicles held by police as the red and beige Toyotas belonging to the persons he believed responsible for the murders.

Upon cross-examination, McCraney was impeached with his prior testimony given at defendant's first trial that he last saw defendant and Rainge among the group of persons on the courtyard side of his apartment at "roughly" 2:47 to 2:48 a.m. McCraney explained, however, that he had never provided a specific time, but had estimated time based upon a television show, "Kojak," and the 45-minute song which he had been composing. According to McCraney, "Kojak" had been on television "in the neighborhood" of 2 a.m., and he had played the song throughout the show and afterwards, but had not played it "straight through" due to interruptions. At the time that he had last viewed defendant's car on Hammond Lane, the show had been over for longer than an hour. (The parties subsequently stipulated that "Kojak" aired on May 11, 1978, from 12:40 to 1:51 a.m. Eastern Standard Time.) Additional testimony of McCraney given at defendant's first trial was then introduced, which was that he had played his song once after "Kojak" ended and was playing it a second time by 3 or 3:15 a.m. In addition, two prior inconsistent statements of

McCraney were introduced to the effect that the group of persons had entered the abandoned building both at 2:15 to 2:30 a.m. and at 2:30 to 2:45 a.m. When questioned regarding these prior statements, McCraney maintained that they were in error.

McCraney testified that he had one clock in his home at the time he viewed these events. He maintained that his previous testimonies at defendant's first trial (no clock in home) and at Jimerson's separate trial (two clocks in home) were, respectively, incomplete, and possibly in error.

McCraney acknowledged that he had been given $1,000 by the State's Attorney's office in late 1978 for costs related to the relocation of his family. McCraney also acknowledged that in 1984, when he was again called to testify and was being threatened, he was given an additional $1,400 to purchase a car necessary to relocate his family out of State. Also, prior to testifying at defendant's second trial, McCraney was given $1,200 to once again relocate his family.

### Officers Capelli and Pasterik's Testimony

Cook County Sheriff's Police Investigator David Capelli and his partner, Patrick Pasterik, testified that they responded to the call concerning Lionberg's disappearance from the service station. When they arrived, they searched an auto which was parked behind the station and discovered a woman's purse. The purse contained Schmal's driver's license, receipts for a man's wedding band and a dress deposit, and an envelope marked "Money for car," which contained $125 in cash. The officers proceeded to Schmal's residence, spoke with her father, and obtained a photo which depicted both Schmal and Lionberg.

Several days later, when Capelli and Pasterik were conducting their investigation at the site of Lionberg's

newly discovered body, they received a police dispatcher's call on their hand-held radio. The dispatcher related that information had been received from an anonymous caller that the "killers" were present at the site, that they were watching the police investigation and had a red Toyota. After receiving this information, the two officers walked directly toward the crowd of onlookers. They observed defendant and Jimerson "briskly" emerge from the crowd and begin walking away. The officers followed and observed that either or both defendant and Jimerson looked back over their shoulders and speeded up their walk. The officers, in turn, walked faster following defendant and Jimerson to a red Toyota parked nearby. The officers stopped defendant and Jimerson just as the two men reached the vehicle. Defendant was standing with car keys in hand by the driver's door and Jimerson stood by the front passenger's door. According to Capelli, he and Pasterik initially focused their attention on defendant and Jimerson because they were the only two persons to briskly emerge from the crowd as the officers approached and then walk quickly away.

After the officers conducted an inventory search of the Toyota with defendant's consent, defendant and Jimerson were taken into custody and transported to the Homewood sheriff's police station.

### Gray's Testimony

Gray testified that on the evening of May 10, 1978, she and her boyfriend, Kenneth Adams, sat listening to music in his car parked in the vicinity of her family's apartment located at 1525 Hammond Lane. Gray was 17 years old at the time and had not attended school past the ninth grade.

After a while, defendant drove up in his red Toyota and asked the couple whether they wanted any beer.

They declined and, shortly thereafter, defendant left the area in his car. Gray and Adams continued to listen to music, but after some time, Gray became tired and went home. While she was inside her apartment, however, she heard a "strange noise" which, under cross-examination, she acknowledged was conversation. Gray left her own apartment and went next door to a vacant, unlighted apartment. She looked out the window towards the front of the apartment (Adams' car had been parked in back). Gray saw defendant, Adams, Rainge and Jimerson around defendant's car, which was stuck in the mud. Defendant then saw Gray, "came over" to her and grabbed her arm, but she resisted. Defendant then told Gray to accompany him and she did. When they approached defendant's car, Gray saw two white adults, a male and a female, in the back seat of the car. The entire group of persons, two whites, defendant, Adams, Rainge, Jimerson and Gray then entered the building located at 1528 Cannon Lane. At the time, Gray saw no one trying to get defendant's car out of the mud, nor did she hear the car's motor running loudly, or running at all. When the group entered the building, the car was still sitting in the mud.

Once the group entered the building, Rainge remained on the first floor with the white male while the others went upstairs to a back bedroom on the second floor. Once there, defendant ordered the·woman to undress, and she complied. According to Gray, she was able to see what occurred because defendant had given her a "Bic" lighter to light the room. Gray observed defendant rape the woman, as did Jimerson and Adams in succession. Jimerson then went downstairs, relieved Rainge, and Rainge raped the woman. Defendant and Jimerson then raped the woman a second time. When defendant instructed Adams to also do so again, he declined at Gray's urging. Jimerson, however, relieved Rainge once

more, and Rainge raped the woman again. Defendant then told the woman to turn over onto her stomach. He removed a "big" gun from his pocket, placed it close to the woman's head and shot her twice.

The group then returned to the first floor where the white male was being watched by Jimerson. The entire group, with the exception of Adams who went home, then went outside near the creek. Despite being familiar with defendant, Rainge, and Jimerson for only one month, Gray testified, she was not afraid. Defendant then told the man to lie on his stomach. Gray was standing approximately 16 feet away in the unlit, darkened area and saw defendant shoot the man twice in the head. Defendant then gave the gun to Rainge, who shot the man once in the back. After Rainge returned the gun to defendant, defendant threw it into the creek. Defendant warned Gray that if she said anything, he would kill her and her family. Defendant's threat frightened Gray at the time. Following these events, Gray returned home.

Gray's version of the events of the crime was not impeached under cross-examination, except that she stated that she did not remember or did not know whether she had gone immediately home after the shootings. Gray, however, denied ever lying under oath, but then acknowledged that she had changed her testimony at defendant's preliminary hearing. Gray also denied or could not remember previously testifying at the preliminary hearing to the effect that her grand jury testimony had been coerced. In response to most questions concerning previous inconsistent statements made during both defendant's preliminary hearing and Gray's first trial, Gray stated that she could not remember. Neither could she remember, among other things, events surrounding her protective custody; seeing Attorney Weston seated at the defense table during the preliminary hear-

ing, or seeing him at all at that time; whether she had been previously tried; whether she had testified at trial; whether she had testified on other occasions, including the grand jury, even though transcripts were introduced; anything about her new trial other than that she would receive one; how she got inside the building that day before trial; whether she had a lawyer, or whether she had just testified that she had a lawyer, or that Weston had previously represented defendant. Gray did, however, testify that she had a problem "remembering things." Gray also testified that while she was imprisoned, she had attempted to complete her high school graduation requirements, but was unable to do so.

During cross-examination by codefendant's counsel, Gray was extensively questioned regarding whether the testimony she gave was prompted in hopes of receiving leniency. Although Gray did not understand the term "leniency," she denied having any such expectations, denied discussing the issue with her lawyer, but said that her lawyer had told her "to tell the truth." She further maintained that police had not beaten or verbally abused her when they had initially questioned her in 1978.

The transcript of Gray's grand jury testimony was subsequently introduced as substantive evidence by the State. Likewise, the defense introduced Gray's entire preliminary hearing question-and-answer testimony as substantive evidence. Six statements of Gray, made during her first trial, defendant's death penalty hearing, and Jimerson's trial, were also introduced by the defense for purposes of impeachment.

## Additional Evidence

A post-mortem examination and autopsy of Lionberg's body by the Cook County medical examiner revealed the existence of four bullet wounds. One bullet had entered Lionberg's back and exited his chest. Two

bullets had entered the back of his head and lodged in his brain. Similarly, the examination and autopsy of Schmal's body on that same date showed that two bullets had entered the back of her head. These had been fired presumably at close range, as indicated by the presence of a stippling effect around the wounds. The examiner further determined that both victims had been killed where their bodies were found.

Additionally, a police forensic firearms expert determined that Lionberg and Schmal had been killed by the same gun, but that the type of gun was unknown. This determination was made after Gray testified before the grand jury.

No physical evidence was introduced by the State other than photos of the victims, the scene, and defendants, bullet casings found at the scene, and a money changer belt which Lionberg was found wearing at death. The whereabouts of defendant's red Toyota which the police had impounded was unknown to all parties.

## DISCUSSION

### Motion to Quash Arrest and Suppress Evidence

Defendant contends that the trial court erred by denying his pretrial motion to quash arrest and to suppress evidence. Defendant maintains that his warrantless arrest was not supported by probable cause (see *People v. Free* (1983), 94 Ill. 2d 378, 398-99), and therefore any evidence obtained as a result, ought to have been suppressed (see *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407). Defendant claims that the potentially excludable evidence is Capelli and Pasterik's testimony concerning the circumstances surrounding the arrest and the arrest, itself. We disagree. The potentially excludable evidence is, rather, testimony as to matters observed during the allegedly unlawful ac-

tivity. (See *Wong Sun v. United States*, 371 U.S. at 485, 9 L. Ed. 2d at 454, 83 S. Ct. at 416.) Their testimony was that defendant and Jimerson walked quickly to and were standing beside a red Toyota and that they were arrested. We turn now to consider the legality of defendant's arrest.

A reviewing court will not disturb a trial court's finding on a motion to suppress, unless that finding is manifestly erroneous. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 165.) Our task on review is simply to ensure that the trial court had a substantial basis for concluding that probable cause existed. *Illinois v. Gates* (1983), 462 U.S. 213, 238-39, 76 L. Ed. 2d 527, 548, 103 S. Ct. 2317, 2332; *People v. Tisler* (1984), 103 Ill. 2d 226, 248.

The trial court making a probable cause determination is to apply standards at least as stringent as those that guide a magistrate in deciding whether to issue a warrant. (*People v. Adams* (1989), 131 Ill. 2d 387, 398; *People v. Tisler*, 103 Ill. 2d at 236.) The trial court must determine whether " 'a reasonable and prudent man, having the knowledge possessed by the officer at the time of the arrest, would believe the defendant committed the offense.' " (*Tisler*, 103 Ill. 2d at 237, quoting *People v. Wright* (1968), 41 Ill. 2d 170, 174.) Whether the necessary probability exists is governed not by technical legal rules, but rather by commonsense considerations that are factual and practical. (*People v. Mitchell* (1970), 45 Ill. 2d 148, 153-54.) This review cannot be tainted by hindsight which may luckily seem to be supported by the fruit of some criminality; rather, the review must center on the information available to the officers preceding the arrest. *People v. Adams*, 131 Ill. 2d at 398.

If the facts supplied in an informant's tip are essential to a finding of probable cause, the tip must meet standards of reliability before it can be considered in de-

termining probable cause. (*People v. James* (1987), 118 Ill. 2d 214, 222; *People v. Tisler*, 103 Ill. 2d at 236-37.) Under the totality of the circumstances analysis, a deficiency in one prong of the traditional test of an informant's tip (credibility or reliability) may be compensated for in determining the overall reliability of the tip by a showing as to the other (the basis of knowledge). *Illinois v. Gates*, 462 U.S. at 233, 76 L. Ed. 2d at 545, 103 S. Ct. at 2339.

Substantial corroboration would not only establish an informant's veracity, but would also support an inference that an informant obtained his story reliably. (*People v. Tisler*, 103 Ill. 2d at 251.) Whether such corroboration consists of innocent or incriminating activity is not the question. Instead, the proper focus is " 'whether the actions of the suspects, whatever their nature, give rise to an inference that the informant is credible and that he obtained his information in a reliable manner.' " *People v. Tisler*, 103 Ill. 2d at 251, quoting *Illinois v. Gates*, 462 U.S. at 269, 76 L. Ed. 2d at 568, 103 S. Ct. at 2348 (White, J., concurring).

McCraney's tip was the essential ingredient to the determination of probable cause by Capelli and Pasterik. McCraney advised police that those persons responsible for the slayings were in a crowd of spectators observing the police investigation of the crime scene. His tip further provided that these persons had a red Toyota which was located nearby.

We believe that the almost immediately observable actions of the defendant, *i.e.*, his "brisk" emergence from the crowd, his quickly walking away from approaching police towards a red auto and looking over his shoulder, support an inference that McCraney was credible and his information was reliable. Such corroborated information, combined with the officers' experience and knowledge, provided a substantial basis for the trial

court to conclude that probable cause existed. Consequently, the defendant's motion to quash arrest and suppress evidence was properly denied.

### Disallowance of Gray's Testimony During Hearing on Motion *In Limine*

Defendant contends that the trial court improperly refused to allow Gray to testify at a pretrial competency hearing, despite the existence of medical testimony that Gray had been diagnosed and hospitalized with an "acute schizophrenic reaction" immediately after the killings.

Defendant filed a pretrial motion styled "Motion in Limine to Bar the Testimony of Paula Gray," on the basis of her alleged incompetency. Attached to the motion were copies of Gray's hospital records for May 22-24, 1978, written and signed by Dr. Watkins.

Prior to hearing on the motion, the trial court ruled that Gray would not testify because the mere fact of defendant's challenge to her competency did not, by itself, justify a competency hearing. The trial court determined, however, that if defendant made a sufficient showing which would call Gray's competency into question, the court would then conduct a hearing as to competency and her testimony would be allowed. Defendant failed to make such a showing, however, and no competency hearing was held.

Factors warranting a decision to conduct a preliminary inquiry as to competency must necessarily call into question the witness' ability to observe, recollect, and communicate. (See *People v. Jones* (1988), 123 Ill. 2d 387, 405; see also *People v. Porter* (1981), 96 Ill. App. 3d 976, 984 (defense denied the opportunity to *voir dire* witness with respect to competency on the basis of an arrest record indicating previous narcotics charges).) Even where a competency determination is to be made,

due process does not require an examination of the witness by the challenging party. See *People v. Seel* (1979), 68 Ill. App. 3d 996, 1002-03.

In the present case, medical records produced by the defense in support of its motion and the testimony of Dr. Watkins failed to establish a connection between Gray's past mental problem and her ability to give competent testimony. Hospitalization itself does not reflect on Gray's competence to testify at trial; at most it established that she had once been treated for an acute schizophrenic reaction, albeit shortly after the killings, a fact the State conceded. In addition, there was no showing that Gray continued to suffer from such disability, or that she was thus disabled at the time of the killings. Consequently, we find that the trial court's denial of defendant's request to examine Gray was in the exercise of sound discretion.

Defendant maintains, however, as a related matter, that the subsequent admission of Gray's testimony at trial was plain error because she was incompetent. A witness is competent to testify if he has the capacity to observe, recollect, and communicate, and his mental deficiency is considered only insofar as it affects credibility. (*People v. Jones* (1988), 123 Ill. 2d 387, 405; see *People v. Dixon* (1961), 22 Ill. 2d 513, 515-16.) Thus, sanity is not the test of competency. (*People v. Seel*, 68 Ill. App. 3d at 1006.) Likewise, an individual suffering from mental retardation is legally competent to testify so long as he possesses the requisite capacities, and the burden to show otherwise is upon the party questioning competency. (*People v. Spencer* (1983), 119 Ill. App. 3d 971, 977.) The determination of whether a witness is competent to testify is within the sound discretion of the trial court and may be arrived at either through preliminary inquiry or by observing the witness' demeanor and ability to testify during trial. See *People v. Spencer*, 119 Ill.

App. 3d at 976; *People v. Ford* (1985), 139 Ill. App. 3d 894, 901.

Our review reveals that the trial court's subsequent admission of Gray's testimony at trial was proper. Gray's testimony *in toto* indicates that Gray was a competent witness. Any inconsistency regarding whether Gray had previously lied under "oath" obviously concerned her inability to understand the meaning of the term "oath," rather than a failure to understand any moral duty to tell the truth. It is true that Gray displayed a marked tendency to remember events under direct examination, and to forget matters unrelated to the crime itself during cross-examination. Yet, this tendency appears somewhat justified given the fact that much of that cross-examination concerned whether she remembered making certain specific statements during any of several, previous separate hearings. In total, we believe that Gray's memory lapses, however, reflect more upon her credibility than her capacities. She even admitted that her memory improved "a little bit" upon redirect examination.

In the final analysis, the trial court is in the best position to ascertain a witness' competence based upon her appearance and conduct at trial and we will not disturb that finding absent an abuse of discretion. (See *People v. Garcia* (1983), 97 Ill. 2d 58, 78.) We find none here.

## The Conduct of *Voir Dire*

Defendant raises four arguments in support of his contention that the conduct of *voir dire* represented an abuse of discretion. First, defendant maintains that questioning conducted in the presence of the entire venire was improper under the circumstances of this case.

The record shows that defendant filed a motion requesting that the trial court conduct a sequestered *voir dire* of prospective jurors, which the trial court granted

over objection. Some months later, however, when the case was ready for trial, no additional courtrooms were available in which the trial court could conduct the sequestered *voir dire* as had been originally contemplated. The trial court rejected a suggestion by defense counsel concerning a possible alternative as being logistically difficult considering security, and stated that it had likewise considered several alternatives, but none seemed feasible. Consequently, the trial court reversed its earlier ruling by stating that it would conduct *voir dire* in the presence of the entire venire. The parties might, however, exercise their peremptory challenges in chambers, out of the presence of the prospective jurors.

During the general questioning of prospective jurors, the trial court inquired as to whether they had previous knowledge of the case. Those nine prospective jurors who had were then questioned in detail regarding that knowledge, and specifically asked whether they could remain fair and impartial. The questioning did not reveal the details of their knowledge. Each one of the nine prospective jurors were eventually either peremptorily excused or excused for cause.

In *People v. Neal* (1985), 111 Ill. 2d 180, we considered this same issue. There, as here, the trial court ruled that, because of the lack of security and available facilities, *voir dire* could not be conducted as requested. The trial court allowed that individual, rather than collective, responses from jurors concerning death penalty questioning would be received, and directed counsel to avoid prejudicial wording of questions. We held that, while Supreme Court Rules 431 and 234 (134 Ill. 2d Rules 431, 234) allowed the trial court, in the exercise of discretion, to conduct individual *voir dire* out of the presence of other jurors, it was not required to do so. (*People v. Neal*, 111 Ill. 2d at 198.) We found that the precautions taken by the trial court to prevent prejudice sufficiently

dispelled any suggestion of taint caused by its failure to individually question jurors.

As in *Neal*, the trial court here was constrained by physical and security factors which compelled that *voir dire* be conducted in the presence of all prospective jurors. Considering that the trial court sought to effectively eliminate the possibility of taint by individual questioning of those prospective jurors who expressed knowledge of the case, we do not find an abuse of discretion. Neither do we find that the trial court's directive to the prospective jurors to "listen carefully" undercut those preventive measures. Moreover, we do not find any suggestion of taint since every juror, thus individually questioned, was subsequently eliminated from the panel.

Defendant next maintains that the trial court's questioning of the prospective jurors pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, improperly resulted in a jury that was conviction-prone and unrepresentative of the community. We have repeatedly held that the qualification of jurors pursuant to *Witherspoon* does not deny a defendant the right to a jury drawn from a fair cross-section of the community, nor does it result in a conviction-prone jury. (*People v. Flores* (1989), 128 Ill. 2d 66, 92; *People v. Gacy* (1984), 103 Ill. 2d 1, 37-38.) Since defendant has not presented any argument which we have not previously considered, and this case does not involve a unique factual situation, we decline to reconsider our stated position.

Defendant's third contention is that the trial court erred in excluding a prospective juror for cause who was not irrevocably committed to vote against the death penalty regardless of facts and circumstances. (See *Gray v. Mississippi* (1987), 481 U.S. 648, 95 L. Ed. 2d 622, 107 S. Ct. 2045.) We disagree. Exclusion was proper.

A capital defendant's right to an impartial jury prohibits the exclusion of venire members simply because they voice general objections to the death penalty or express conscientious or religious scruples against its infliction. (*Witherspoon*, 391 U.S. at 522, 20 L. Ed. 2d at 785, 88 S. Ct. at 1777.) The Court reasoned that the exclusion of venire members must be limited to those who were "irrevocably committed *** to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings" and to those whose views could prevent them from making an impartial decision on the question of guilt. (*Witherspoon*, 391 U.S. at 522 n.21, 20 L. Ed. 2d at 785 n.21, 88 S. Ct. at 1777 n.21; see *Gray v. Mississippi* (1987), 481 U.S. 648, 95 L. Ed. 2d 622, 107 S. Ct. 2045.) The relevant inquiry is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt* (1985), 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852; see *Gray*, 481 U.S. at 658, 95 L. Ed. 2d at 633, 107 S. Ct. at 2051.

In *People v. Collins* (1985), 106 Ill. 2d 237, we applied the standard set forth in *Witt* and held that the trial court properly excluded a prospective juror based on his responses to *Witherspoon* questions. The prospective juror's responses had been equivocal as to whether he would ever impose the death penalty. However, he finally responded that it was true that he could not consider the death penalty. Recognizing that the trial court was in a superior position to ascertain the meaning which the juror intended to convey, we expressed our satisfaction that the juror was excused in compliance with *Witherspoon. People v. Collins*, 106 Ill. 2d at 280.

In the present case, the juror in question first unequivocally stated that she had scruples against the death

penalty. The juror then indicated that she did not possess such scruples regardless of the facts. When next asked, however, whether her scruples would impair her ability to determine guilt or innocence, she responded almost inaudibly that she did not understand the question. When asked the question again after a brief explanation, the juror replied, "[N]o, I don't believe ***," but the trial court could not hear anything except "[N]o." When finally asked whether, if defendant was found guilty of murder, she could consider all the possible penalties available, including the death penalty, the juror replied, "[N]o." In ruling on the matter, the trial court commented upon the juror's physical expressions, and the fact that she was a teacher, appeared intelligent, seemed to understand clearly, but also seemed reluctant to answer.

Based upon this review, we are convinced that the trial court did not abuse its discretion by determining that this juror's views would substantially impair the performance of her duties.

Defendant's final related argument on this issue has two components. First, defendant maintains that the trial court abused its discretion by denying his request for attorney-conducted *voir dire* pursuant to Supreme Court Rule 234 (134 Ill. 2d R. 234). Second, defendant claims that the trial court's stated standard *voir dire* procedure, generally disallowing counsel's direct participation, operated as an abuse of discretion.

Supreme Court Rule 234 provides that "[t]he court shall conduct the *voir dire* examination of prospective jurors by putting to them questions it thinks appropriate touching their qualifications to serve as jurors in the case on trial. The court *** *may permit* the parties to supplement the examination by such direct inquiry as the court deems proper." (Emphasis added.) (134 Ill. 2d R. 234.) "Examination of prospective jurors by court or by

counsel is \*\*\* a matter of trial detail which courts can regulate in the exercise of judicial discretion." (*People v. Jackson* (1977), 69 Ill. 2d 252, 260.) Upon review, the Illinois appellate court has held that the standard for evaluating the court's exercise of discretion during the *voir dire* is whether the questions and procedures created reasonable assurance that any prejudice or bias would be discovered. *People v. Sanders* (1986), 143 Ill. App. 3d 402, 405.

Defendant filed a pretrial motion to permit defense counsel to participate in the full *voir dire* of the jury. Following arguments on the motion, the trial court outlined the *voir dire* procedure which it usually employed, which was to question prospective jurors itself, allow supplemental written questions, and permit sidebars during the actual questioning in the event sufficient information was not elicited. Beyond that, the trial court stated that it did not usually allow counsel to participate. The trial court acknowledged, however, that it would consider attorney participation in *voir dire* in "exceptional circumstances."

During the subsequent *voir dire*, the trial court questioned each prospective juror concerning, *inter alia*, biographical background, prior jury service and knowledge of the case, relationships and acquaintances with attorneys, victims, witnesses, defendants, police officers, judges, group affiliations, and racial prejudice. Jurors were "Witherspooned" and questioned pursuant to *People v. Zehr* (1984), 103 Ill. 2d 472. When the trial court conducted *voir dire* of the prospective juror who admitted to scruples concerning the death penalty, defense counsel asked to participate. The trial court, however, denied the request, stating that the juror might be influenced to change her responses.

We believe that the questioning and procedures revealed by this record reasonably assured that prejudice

and bias would be discovered. We can discern no reason whatsoever to conclude that the trial court abused its discretion in denying counsel's participation. The trial court's usual procedure, even if routinely adhered to, fully comports with Rule 234 (134 Ill. 2d R. 234). Accordingly, defendant's argument lacks merit.

### Racially Motivated Exclusion of Potential Jurors

Defendant contends that the trial court failed to require the State to sufficiently explain its use of three peremptory challenges of blacks in violation of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. Specifically, defendant argues that he established a *prima facie* case of three racially motivated peremptory challenges; yet, the trial court found otherwise. We note that upon review a trial court's determination that a defendant has failed to establish a *prima facie* case of discrimination will not be overturned unless it is against the manifest weight of the evidence. *People v. Evans* (1988), 125 Ill. 2d 50, 71.

Initially, the State counters that defendant has waived consideration of any potential *Batson* issue by failing to create a record of the race of the prospective jurors chosen and excluded. (See *People v. Sims* (1987), 166 Ill. App. 3d 289, 311-12.) Our review of the record indicates, however, that the race of at least 17 venire members was established. Furthermore, our review reveals that defense counsel attempted to create a more complete record, but the trial court disallowed counsel's attempt, stating that the record stood for itself. Accordingly, we find no waiver of the issue.

To meet the first element of the *Batson* test for establishing a *prima facie* case of discrimination, a defendant must show the prosecutor exercised his peremptory challenges to remove members of a cognizable racial group from the venire. (*Batson*, 476 U.S. at 96, 90 L.

Ed. 2d at 87, 106 S. Ct. at 1723.) The only question which then remains is whether considering "all relevant circumstances," a *prima facie* case of discrimination has been established. (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723; *People v. Mahaffey* (1989), 128 Ill. 2d 388, 412-13.) Once the defendant establishes a *prima facie* case, the burden shifts to the prosecution to come forward with race-neutral reasons for striking the black venire members. *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.

Relevant circumstances a trial court may consider when determining whether a *prima facie* case of discrimination has been established include: a " 'pattern' of strikes against black jurors" (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723); the disproportionate use of peremptory challenges against blacks; whether the excluded blacks were a heterogeneous group sharing race as their only common characteristic; the level of black representation in the venire as compared to the jury; the race of the defendant and the victim. (*Mahaffey*, 128 Ill. 2d at 413, citing *People v. Evans* (1988), 125 Ill. 2d 50, 63-64.) The trial court, however, must avoid arbitrarily deciding this delicate question solely from the number of blacks peremptorily challenged. *Mahaffey*, 128 Ill. 2d at 413; *Evans*, 125 Ill. 2d at 64, citing *People v. Hooper* (1987), 118 Ill. 2d 244, 247-49.

The record demonstrates that two blacks were selected for the first panel of four jurors and the State had 20 peremptory challenges remaining. A third black was selected for the second panel and, at that time, the State had at the least 18 peremptory challenges remaining, having exercised three. After the State utilized its 13th, 14th, and 15th peremptories against three blacks, defense counsel objected on the basis that these persons were indistinguishable from whites accepted by the State, except for their race. At this point the State had

exercised six peremptories against blacks concerning whom defense counsel conceded there was a minimal basis for challenge. It had also challenged, at the least, three nonblack persons, a young female with a European surname and two persons whose race is not of record, including a female implicitly identified as black.

Following argument, the trial court ruled no *prima facie* case of discrimination under *Batson* had been established. In ruling, the trial court stated that it considered all of the circumstances it had had the benefit to observe, including the number of blacks accepted relative to the number of challenges remaining to the State. The trial court requested, however, that the State provide the basis for its three challenges for the benefit of the record. According to the State all three of the challenged black jurors were in their 20s, owned no property, had no long-standing positions or affiliations in the community, and were not married. The trial court then stood on its previous decision.

We conclude that the trial court's finding that defendant failed to establish a *prima facie* case of discrimination was not against the manifest weight of the evidence. The trial court had the benefit of observing the tenor of the State's challenges, and could determine that some blacks had been accepted while the State still possessed peremptory challenges, that more had been justifiably challenged, and that a sizeable representation of nonblacks had also been challenged. Furthermore, the trial court could also determine the extent to which the three jurors in question were, in fact, similar to whites who had been accepted. We therefore decline to overturn the trial court's decision on the basis of the record as it stands.

Evidence and Argument of Witness Intimidation

Defendant next contends that plain error occurred by

the admission of McCraney's testimony that he was fearful of defendant, had been threatened, and that he and his family were relocated. Defendant also maintains that the State was improperly allowed to argue, in closing, such alleged intimidation of McCraney and his family.

Prior to trial, the State provided the defense with information that McCraney had received sums of money for relocation purposes. During direct examination of McCraney at trial, the State elicited testimony concerning several relocations, and the amounts of money McCraney received from the State for each move. Before giving that testimony, McCraney testified that he did not identify himself when he initially called the police because "they" (the suspects) had friends and relatives in the area, and he was concerned about the safety of his wife and four daughters. McCraney also attributed his request for relocation to his concerns for the safety of his family. Defense counsel made no objection to this testimony.

In response to subsequent questioning regarding what he was doing at the time he was called to testify in 1984, McCraney replied that he was living with his family and being threatened. Defense counsel objected to this testimony. The trial court, however, overruled the objection on grounds that McCraney's testimony of "being threatened" was probative of the reasons for his relocation. The trial court also concluded, *inter alia*, that the testimony was not prejudicial because the jury was aware that both defendants were in custody in 1984.

The State continued to examine McCraney about his 1984 relocation and McCraney testified that the State paid $1,400 to a car dealer in his behalf. When asked why this money was paid, McCraney responded, "[B]ecause I had been approached by three men—." Defense counsel then interrupted with an objection which was sustained.

Despite defendant's failure to object and raise this issue in a written post-trial motion, we will review pursuant to the plain error doctrine, as the evidence in this case is closely balanced. *People v. Herrett* (1990), 137 Ill. 2d 195, 209; 134 Ill. 2d R. 615(a).

In the present case, the State could reasonably anticipate that the defense would attempt to impeach McCraney during cross-examination with evidence that he had received several sums of money from the State for relocation. (See *People v. Gonzalez* (1984), 104 Ill. 2d 332, 337, quoting *Davis v. Alaska* (1974), 415 U.S. 308, 316-17, 39 L. Ed. 2d 347, 354, 94 S. Ct. 1105, 1110 (the partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony"); see also *People v. Harris* (1988), 123 Ill. 2d 113, 147.) Furthermore, the State could expect that the trial court would allow defense counsel the widest latitude in establishing any bias or motive on McCraney's part. See *People v. Wilkerson* (1981), 87 Ill. 2d 151, 156.

Considering that prospect, the State obviously chose to anticipatorily impeach McCraney with questions concerning the money he received and the purposes for which it was used. Supreme Court Rule 238(a) allows such anticipatory impeachment to reduce the prejudicial effect of certain evidence upon a witness' credibility. (134 Ill. 2d R. 238(a). See *People v. Soskins* (1984), 128 Ill. App. 3d 564, 573.) Certainly, this evidence was probative of any bias that McCraney might have. (See *Gabosch v. Tullman* (1974), 21 Ill. App. 3d 908, 913.) Significantly, defense counsel did not find this line of inquiry objectionable and in fact cross-examined McCraney regarding the relocations and monies received as the State had anticipated. Consequently, we cannot say that defendant was prejudiced, and find that the admission of this testimony was a proper exercise of discretion.

With respect to McCraney's fears for the safety of his family, McCraney's testimony did not link his fear to defendant. While the mere fact that the evidence did not link the threats to defendant does not vitiate any possibility of prejudice (see *People v. West* (1971), 3 Ill. App. 3d 106, 119), prejudice to the defendant must still be judged by considering the nature of the evidence, itself. Here, McCraney simply made general statements about being afraid, a reaction quite reasonable for any person in McCraney's position. Hence, we do not find that allowance of McCraney's testimony that he was afraid to involve himself prejudiced defendant.

Concerning McCraney's two responses that he was threatened, we find that such statements were properly allowed even without curative instruction. Each of McCraney's responses mentioning threats were probative of the reasons for McCraney's relocations. Even so, McCraney's statements appear not to have been purposely elicited in that one at least was voluntarily offered and both were nonresponsive to the particular questioning. Even defense counsel acknowledged this fact during a sidebar at the time ("I am afraid the man is going to answer something that you didn't ask him"). Considering the nature of the evidence here, and its manner of introduction, we cannot say that such testimony was improperly allowed.

This case is not comparable to *Dudley v. Duckworth* (7th Cir. 1988), 854 F.2d 967, relied upon by defendant. In *Dudley*, the prosecutor elicited a witness' testimony of anonymous telephone threats supposedly in order to explain the witness' nervousness during his direct examination. The appeals court found no indication from its review of the record that the witness was nervous except for a suggestion which was prompted by the prosecutor's questioning. The court noted that the prosecution made no attempt to explore that part of the witness' tes-

timony which seemed to indicate that his condition might be explained on some basis other than threats. Additionally, the court found a strong possibility that the witness' condition was simply a pretext for the prosecution's line of inquiry, inasmuch as no measures were taken to calm the witness, and after testifying to the threats, there was no further concern with his condition.

By contrast, in the present case, there was good reason for the prosecution to undertake the particular line of questioning which elicited the complained-of responses. In addition, the State did not manipulate the questioning in such a way that encouraged McCraney to testify about threats, nor did the State continue to explore the subject of threats. McCraney's statements were quite brief and, therefore, must be viewed in the context of this lengthy trial. Furthermore, the State did not rely upon any evidence of threats during closing argument.

Finally, defendant contends that the prosecution improperly emphasized evidence of McCraney's intimidation during closing argument. Defense counsel did not object to the allegedly prejudicial argument, and any error would normally be considered waived unless the comments were so inflammatory that defendant could not have received a fair trial, or so flagrant as to threaten deterioration of the judicial process. (*People v. Owens* (1984), 102 Ill. 2d 88, 104.) We have considered the comments allegedly constituting prejudicial error and they do not rise to either level.

During closing the State remarked that McCraney had children and did not know if he wanted to get involved. The prosecutor argued that McCraney called police, reasoning to himself:

"[M]aybe I will be willing to testify if they are picked up and I can be relocated."

The prosecutor then urged the jury to consider McCraney:

> "Charles McCraney is just a decent human being. I am sure today he regrets ever making that phone call or at least ever coming forward. You heard that he had to go to court over and over again, and be questioned at length by lawyers as Mr. Gant. *** [F]or gosh sake, he has even had to move his wife and daughters. He lost a job from E & R Securities, because of his involvement in this case."

The argument that McCraney was relocated several times was based upon evidence properly admitted at trial to which defendant did not object and which he, in fact, explored on cross-examination. (See *People v. Owens*, 102 Ill. 2d at 105.) Moreover, the State's argument did not argue any correlation between McCraney's relocation and any threats, nor did it emphasize McCraney's fears. Accordingly, we do not find that defendant suffered any prejudice by these remarks.

### Admission of Prior Consistent Statements

Defendant maintains that the admission into evidence of Gray's grand jury testimony as a prior consistent statement denied him a fair trial and constituted plain error.

At trial, codefendant's counsel's cross-examination impugned Gray's motive to testify and extensively questioned her expectations as to leniency regarding her pending retrial. Gray was also substantially impeached by the introduction of her prior inconsistent statements given during previous proceedings. Without objection, the State subsequently introduced, through a court-reporter witness, Gray's grand jury testimony. Again, despite defendant's failure to object at trial and raise this issue in a written post-trial motion, we take cognizance

of this issue by invocation of the plain error rule. 134 Ill. 2d R. 615(a).

A witness may not be corroborated on direct examination by proof of prior statements consistent with his testimony. (*People v. Powell* (1973), 53 Ill. 2d 465, 472.) Moreover, when a witness is impeached by means of a prior inconsistent statement, if a consistent statement does not disprove or explain the making of the inconsistent statement, it is not admissible. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §611.14 (5th ed. 1990).) However, prior consistent statements are admissible to rebut a charge or an inference that the witness is motivated to testify falsely or that his testimony is of recent fabrication, and such evidence is admissible to show that he told the same story before the motive came into existence or before the time of the alleged fabrication. *People v. Clark* (1972), 52 Ill. 2d 374, 389; *People v. Titone* (1986), 115 Ill. 2d 413, 423; see also *People v. Harris* (1988), 123 Ill. 2d 113, 139; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §611.14 (5th ed. 1990).

Clearly, the defense raised an inference that Gray's trial testimony was motivated by expectations of leniency and was of recent fabrication. Yet, defendant claims that Gray's 1978 grand jury testimony did not qualify as a prior consistent statement because Gray had the same motive to fabricate at that time as she did at trial. (See *People v. Emerson* (1983), 97 Ill. 2d 487, 501.) According to defendant, Gray must have considered, in 1978, that, given the conduct of police and prosecutors towards her, her best strategy was to cooperate with the authorities by fabricating a version of events. We rejected a similar argument upon a similar series of facts in *Titone*, 115 Ill. 2d at 423, and held that the trial court's apparent conclusion was supported by the record and was proper. Likewise, in the instant case, we cannot

say that the trial court erred by admitting Gray's grand jury testimony.

### Admission Into Evidence and Argument of Victims' Personal Traits

Defendant next charges that the trial court committed plain error by admitting into evidence testimony concerning the personal lives of the two victims and arguing such evidence at closing.

At trial, Officer Capelli testified that while beginning their investigation into the victims' disappearances, he and Officer Pasterik found a woman's purse inside a car parked outside the Clark service station. In response to what was found inside the purse, Capelli stated the items found: a driver's license with Schmal's name on it, receipts for a man's wedding band and a woman's dress, and an envelope containing $125 cash with "money for car" handwritten on it. The officer subsequently related how his investigation proceeded on the basis of the driver's license information. During closing argument, as the prosecutor recounted the police investigation at the service station in sequential detail, he mentioned each of the items found in Schmal's purse.

Lionberg's father, William Lionberg, testified at trial without objection that the last time he saw his son alive was on his son's birthday. Mr. Lionberg identified a photograph of Schmal and his son taken together at a gathering on his son's birthday as an accurate depiction as they last appeared. This photograph was given by Mr. Lionberg to Officers Capelli and Pasterik at the beginning of their investigation. Defendant agreed that the photo might be published to the jury and available to them during their deliberations.

Lynn Fisher, Schmal's sister, testified, also without objection, that she last saw Schmal alive a few days before Schmal's death. In response to whether she knew

Lionberg and what had been her relationship to him, Fisher stated that Lionberg and Schmal were engaged to be married. Fisher identified the same photo of Lionberg and Schmal as an accurate depiction of them just before their deaths. Fisher also identified, over objection, the jacket Lionberg was found wearing at death, stating that she knew that it was Lionberg's because it had originally belonged to her father. Fisher then volunteered that Lionberg had needed the jacket and that it had been his style.

The record shows that except for the introduction of Lionberg's jacket, defendant failed either to object or file a post-trial motion alleging error. (*Herrett*, 137 Ill. 2d at 209.) We consider the claimed errors not properly preserved by invocation of the plain error rule so as to preclude argument of the possibility that an innocent man may have been wrongly convicted. *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77.

This court has consistently condemned the introduction of otherwise irrelevant information concerning a crime victim's personal traits or familial relationships at a criminal trial. (*People v. Hayes* (1990), 139 Ill. 2d 89, 141-42; see *People v. Hope* (1986), 116 Ill. 2d 265; *People v. Bernette* (1964), 30 Ill. 2d 359, 371.) However, every mention of such traits or relationships does not *per se* entitle a defendant to a new trial. (*People v. Hayes*, 139 Ill. 2d at 142; *People v. Simms* (1988), 121 Ill. 2d 259, 268-69; *People v. Free* (1983), 94 Ill. 2d 378, 414; see also *People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 392-93.) Rather, the reviewing court must consider the manner in which references to such issues came about. (*People v. Hope*, 116 Ill. 2d at 276-78; *People v. Bernette*, 30 Ill. 2d at 371.) Where presentation of such information is accomplished in a manner which causes the jury to believe that it is material, rather than incidental, its admission is prejudicial and constitutes reversible error. See

*People v. Bernette*, 30 Ill. 2d at 371; *People v. Hope*, 116 Ill. at 278.

In the present instance, nearly all of the evidence which defendant considers objectionable was relevant and admissible. The testimony concerning the contents of Schmal's purse tended to explain the course and direction of the police investigation. The discovery of these particular personal items indicated to police that another person was likely missing in addition to Lionberg. The items also indicated that person's probable relationship to him. While every item in Schmal's purse might not have been necessary to explain these operative assumptions, some reference was necessary and inevitable to explain the circumstances of the police investigation.

Likewise, the photograph of the victims was relevant because it was given to the police to assist them at the onset of their investigation. That the photograph depicted the victims together at Lionberg's birthday gathering was coincidental rather than indicative that the purpose of its introduction was to evoke sympathy. Similarly, testimony concerning Lionberg's jacket was relevant because he was wearing the jacket when he was found shot through the back.

We also believe that the remainder of the testimony of which defendant complains is either probative of the issues (*corpus delicti*), or volunteered responses by a "life and death" witness. Common sense tells us that murder victims do not live in a vacuum and that, in most instances, they were involved in familial relationships. (See *People v. Free*, 94 Ill. 2d at 415.) In sum, we are convinced that the evidence was not presented in a manner as to cause the jury to believe that the victims' personal characteristics or familial relationships were material to the defendant's guilt or innocence. Nor did closing argument concern or at most dwell upon such evidence.

Defendant was not thereby deprived of a fair trial and no error resulted.

## Improper Closing Argument

Defendant also claims that plain error occurred with respect to additional aspects of the State's closing argument. Defendant contends that the prosecutor's argument shifted the burden of proof because the prosecutor told the jury that if they should acquit defendant, they should "[d]o it because you believe that the police framed these men. Because that's what you would have to believe now." Defendant also maintains that the prosecutor's statements that the crimes were the most "horrendous" and "outrageous" in court history improperly injected his personal opinion.

Courts of this State allow a great deal of latitude to the prosecution during closing arguments. (*People v. Shum* (1987), 117 Ill. 2d 317, 341.) For instance, we have recently held that where the defendant's version of the incident differs substantially from the State's, closing arguments similar to those presented here are allowable and not prejudicial. (See *People v. Pecoraro* (1991), 144 Ill. 2d 1.) In the present case, defendant strongly suggested that police experienced community pressure to solve the crimes, that they cooperated to coerce Gray, and that her grand jury testimony was a product thereof. Certainly if the jury were to have found defendant not guilty, it would necessarily have lent credence to this contrary argument.

We note also that defendant's theory regarding possible police coercion was presented in the form of evidence as well as argument. At trial, during cross-examinations, defense counsel sought to portray Gray's grand jury testimony as the product of police coercion and manipulation. Concerning the alleged injection of personal opinion, the record reflects that during opening statements

at trial, defense counsel referred to the offenses as the "most heinous" four separate times. He further stated that the evidence would reveal that a "terrible crime occurred." Certainly, the evidence at trial indeed revealed the offenses to be horrific and defendant never took issue with such evidence, choosing instead to contest the issue of identification. We have held that prosecutorial comments based on facts in evidence or reasonable inferences drawn therefrom fall within the bounds of proper argument, and prosecutorial comments that are invited and not prejudicial do not constitute error. (*People v. Franklin* (1990), 135 Ill. 2d 78, 100.) Thus, the State's closing statements, based as they were upon facts and circumstances proved, or upon the legitimate inferences drawn from them, do not exceed the bounds of proper debate. (See *People v. Shum* (1987), 117 Ill. 2d 317, 347; see also *People v. Sprietzer* (1988), 123 Ill. 2d 1, 38.) Furthermore, even assuming that the State's comments were improper, any error must be deemed harmless, as the record demonstrates that the verdict would not have been otherwise had the comments not have been made. (*People v. Jackson* (1981), 84 Ill. 2d 350, 360.) Accordingly, we find defendant's contention on both scores lacking in merit.

## Insufficiency of the Evidence

Defendant next contends that he was not proved guilty beyond a reasonable doubt inasmuch as Paula Gray's accomplice testimony lacked "an absolute conviction of truth" and was not meaningfully corroborated. *People v. Young* (1989), 128 Ill. 2d 1, 48.

The testimony of an accomplice witness " 'has inherent weaknesses, being testimony of a confessed criminal and fraught with dangers of motives such as malice towards the accused, fear, threats, promises or hopes of leniency, or benefits from the prosecution.' " (*Young*, 128

Ill. 2d at 47-48, quoting *People v. Hermens* (1955), 5 Ill. 2d 277, 285.) Because it is attended with serious infirmities, accomplice testimony " 'should therefore be accepted only with utmost caution and suspicion and have the absolute conviction of its truth.' " (*Young*, 128 Ill. 2d at 48, quoting *People v. Newell* (1984), 103 Ill. 2d 465, 470.) While such testimony is subject to careful scrutiny, the testimony of an accomplice witness, whether corroborated or uncorroborated, is sufficient to sustain a criminal conviction *"if it convinces the jury of the defendant's guilt beyond a reasonable doubt."* (Emphasis added.) *People v. Collins* (1985), 106 Ill. 2d 237, 261; *People v. George* (1971), 49 Ill. 2d 372, 382; *People v. Nastasio* (1963), 30 Ill. 2d 51, 55.

" '[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be *** whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.' " (*Young*, 128 Ill. 2d at 49, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89.) This inquiry does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt, but whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Young*, 128 Ill. 2d at 49, quoting *Jackson*, 443 U.S. at 318-19, 61 L. Ed. 2d at 573-74, 99 S. Ct. at 2788-89.

A careful review of the record before us in the light most favorable to the prosecution convinces us that a rational fact finder could have found the defendant guilty of murder and rape beyond a reasonable doubt. Paula Gray provided an explicit eyewitness account of the killings, the details of which were not shaken under cross-examination. That account was essentially corroborated

by the version of events she recounted during her grand jury testimony, provided only five days after the offense. As a prior consistent statement, Gray's grand jury testimony, in evidence here, tended to rebut inferences that Gray had a motive to testify falsely in this case, and that her testimony here was a recent fabrication. See *People v. Shum* (1987), 117 Ill. 2d 317, 340-41; *People v. Emerson* (1983), 97 Ill. 2d 487, 500-01.

Moreover, many aspects of Gray's trial account were corroborated by the State's evidence. Forensic testimony established that the victims were killed in the locations where and in the manner in which Gray said they were killed. Additionally, forensic evidence also confirmed that the shots which killed the victims were fired from a single weapon, as testified to by Gray. Furthermore, Mc-Craney's testimony corroborated Gray's testimony with respect to surrounding time and place circumstances, and defendant as a participant within those circumstances. Finally, defendant's suspicious behavior at the crime scene following the discovery of the victim's bodies represented an additional circumstance which corroborated Gray's testimony.

It is significant that the weaknesses in Gray's testimony had to have been readily apparent to the jury. Irrespective of her version of the crime events, Gray's testimony was replete with instances of forgetfulness or decided attempts to frustrate examination. The jury was also aware of Gray's several prior inconsistent statements, in which she flatly denied having any knowledge of the crimes, her apparent limited intellectual abilities, and the fact that she was awaiting retrial as an accomplice. Despite such obvious handicaps, the jury evidently found Gray credible concerning the events she witnessed. Undoubtedly, Gray's unerring exactitude and certainty in relating those traumatic events, given her limited capacities, must have convinced the jury that,

indeed, she was an eyewitness to the crime. To that extent, Gray's testimony carries with it "an 'absolute conviction of its truth.' " (*People v. Ash* (1984), 102 Ill. 2d 485, 493, quoting *People v. Williams* (1976), 65 Ill. 2d 258.) Unlike the accomplice testimony in *Ash,* Gray did not state that she would lie to save her life, but said that she was directed "to tell the truth" by the prosecution. In sum, we conclude that the evidence is sufficient to sustain defendant's convictions.

### Ineffective Assistance of Counsel During the Guilt or Innocence Phase

*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, established a two-pronged test to evaluate ineffectiveness-of-counsel claims. Ineffective assistance of counsel is established by a showing that: (1) counsel's performance was so seriously deficient as to fall below an objective standard of reasonableness under prevailing professional norms; and (2) that the deficient performance so prejudiced the defense as to deny the defendant a fair trial. *Strickland,* 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; see *People v. Albanese* (1984), 104 Ill. 2d 504, 525; *People v. Wright* (1986), 111 Ill. 2d 18, 30.

*Strickland* directed that "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." (*Strickland,* 466 U.S. at 688, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065; *Albanese,* 104 Ill. 2d at 525; see *People v. Harris* (1988), 123 Ill. 2d 113, 156.) A defendant must also overcome a strong presumption that the challenged action "might be considered sound trial strategy." (*Strickland,* 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065; *Albanese,* 104 Ill. 2d at 526.) Furthermore, "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning

of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 80 L. Ed. 2d at 692-93, 104 S. Ct. at 2064; *Albanese*, 104 Ill. 2d at 525.

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *** If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, *** that course should be followed." *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; *Albanese*, 104 Ill. 2d at 527.

In the present case, defendant alleges 11 instances of counsel's ineffectiveness. We shall examine these alleged instances of ineffectiveness in depth.

Defendant first claims that since Gray's identification testimony was the linchpin of the State's case, defense counsel should have introduced evidence that Gray was mentally retarded (see *United States ex rel. Gray v. Director, Department of Corrections* (7th Cir. 1983), 721 F.2d 586, 588), as well as scientific evidence concerning the impact that mental retardation may have upon perception, suggestibility, and moral development. Defendant's related contention is that evidence of Gray's "mental illness" and the scientific effect of mental illness upon perception and memory should also have been introduced. Such evidence, according to defendant, given the "weaknesses" of the State's case, would have tipped the outcome in his favor. We disagree.

Assuming that the proffered scientific conclusions regarding mental retardation in general were admitted and withstood the scrutiny of cross-examination and rebuttal testimony, we do not believe their introduction represents any sounder strategy than allowing the jury to assess the very obvious mental limitations of Gray herself. Particularly so, when the disputed issue, *i.e.*, identifica-

tion, concerns Gray's *individual* capacities and defendant's argument suggests no available independent evidence of that capacity other than her prior IQ scores.

The record also reflects that the defense reasonably viewed evidence of Gray's limited mental capacity as a "two-edged sword." Certainly, if defense counsel had portrayed Gray as extremely malleable and so deficient that she could not distinguish fact from fantasy as the proffered studies argue, he could not have represented, as he did, that Gray was capable when she recanted and also when she testified below allegedly in exchange for leniency. Also, defense counsel quite reasonably could have considered Gray's testimony concerning details of the crime itself, insusceptible to impeachment as the testimony of an extreme mental defective. Thus, defense counsel Gant undertook the quite justifiable strategy of portraying Gray as a self-interested liar and we can find no fault with that approach.

Concerning evidence of a witness' mental health history, while it is relevant as it relates to credibility, and is thus a permissible area of impeachment (*People v. Lindsey* (1979), 73 Ill. App. 3d 436, 447-48), before such evidence may be introduced, its relevance must be established (*People v. Walton* (1982), 107 Ill. App. 3d 698, 703). The onus, too, is on the party seeking to introduce this line of questioning on cross-examination. *People v. Helton* (1987), 153 Ill. App. 3d 726, 733.

In the instant case, Gray was hospitalized and diagnosed by Dr. Robert Watkins, a family practitioner, in consultation with a psychiatrist, as experiencing an "acute schizophrenic reaction" secondary to her interrogation by police fully 11 days after the killings. Gray's hospital discharge summary stated that, after returning home from lengthy police questioning, she had become noncommunicative, and that while she admitted to auditory hallucinations, she denied experiencing visual hallu-

cinations. Gray's hospital record described her past history as "unremarkable," although Dr. Watkins testified during the motion *in limine* hearing that Gray's brother had related at her admission that she had "had a similar mental state" one year previously. Gray was administered Thorazine, became more alert and communicative, and was discharged in two days under advice to seek follow-up examination with the psychiatrist in one week. Watkins testified that, to his knowledge, Gray never followed-up, nor did he see her again until called to testify.

As in *Helton*, this evidence of Gray's mental health history would likely have been considered irrelevant by the trial court. Hospitalization by itself does not reflect upon a witness' competence or credibility; at most it establishes that a witness has been treated for mental illness. Gray's schizophrenic episode was considered by her physicians as a reaction to police questioning. Her condition apparently did not manifest previously, at the time of the crime, nor did it continue after her discharge. Also, apparently, evidence that Gray was under treatment at the time of her testimony, that she continued to take Thorazine, or that Thorazine would affect memory was also not available.

Significantly too, the trial court denied defendant's request that Gray testify at the hearing on defendant's motion *in limine*, but conditionally stated that Gray might testify only if this same mental health evidence impugned Gray's competency. The trial court, however, ruled that it did not. Defense counsel could, therefore, quite reasonably expect that an attempt to introduce this evidence would be fruitless, as it was likely to be considered irrelevant, not serving either to impeach Gray's credibility or impugn her ability to communicate her observations accurately and truthfully. (*Helton*, 153 Ill. App. 3d 726.) In any event, defense counsel is not re-

quired to undertake fruitless efforts to demonstrate his effectiveness.

Furthermore, like the evidence of Gray's mental retardation and the supporting scientific evidence, evidence of Gray's mental health history conceivably cut two ways. The value of this evidence, in terms of impeachment, was substantially offset by its tendency to corroborate Gray's testimony that she was an eyewitness to a violent, traumatic event. Considering that Gant's strategy appears not to admit that Gray was even an actual eyewitness (two defense experts testified to the nonfeasibility of Gray's version of events, and McCraney testified that he did not see Gray enter the abandoned building), the introduction of this evidence was fraught with risk. In sum, we believe that Gant exercised sound trial strategy by allowing the jury to assess Gray's individual capacities firsthand and refraining from introducing scientific evidence of mental retardation in general, as well as detailed evidence of Gray's hospitalization.

Moreover, the cold record on appeal amply demonstrates Gray's limitations as a witness. Gray's testimony is replete with instances of forgetfulness, feigned or honest, her mental dullness and impeachment, all of which the jury evaluated firsthand. Furthermore, the jury was aware that Gray had only a ninth-grade education and had not been capable of completing GED requirements. Given these facts, the evidence defendant suggests would have scant effect on the jury's impression of Gray as a witness. In sum, we do not believe that such slim evidence could further malign Gray's credibility to the extent that the result here would have been different.

Defendant also claims ineffectiveness of counsel on the basis that defense counsel did not offer evidence of Gray's "motive" to lie either at trial or before the grand jury in 1978. The record reflects that Gray testified at defendant's first trial that, at the time of her grand jury

testimony in 1978, State's Attorneys and police had promised that they would provide a house for her mother and jobs for her and her sister. In our view, since there exists no evidence of motive apart from Gray's recantation testimony at defendant's first trial, at a time when Gray was represented by defendant's counsel, the evidence of any motive in 1978 was weak. Defense counsel, thus, cannot be faulted for not offering such evidence of "motive."

With respect to Gray's motive at defendant's second trial, the record shows that prosecutors provided a written discovery response which stated that the State had offered to drop murder charges against Gray if she testified "honestly." The State's Attorney, however, later represented before the trial court that "that's a stronger statement than is actually the fact."[1] Defendant argues that defense counsel was ineffective by failing to offer such alleged evidence of motive.

We note that at trial codefendant's counsel, Maurice Scott, extensively explored this area of impeachment during his cross-examination of Gray, which immediately preceded defense counsel's examination. Scott's questioning was met by Gray's repeated denials and testimony that her counsel had advised her to testify truthfully. The jurors were also aware that Gray was awaiting retrial, and certainly, in today's world, they could understand the ramifications of her cooperation within that context. Their understanding would have been further underscored, also, by defense counsel's closing argu-

---

[1]Defendant implies that defense counsel should be faulted for not further exploring the issue of any agreement since the State admitted in the appeal of Jimerson that it had agreed to drop murder charges if Gray testified against Jimerson, defendant and Rainge. (See *People v. Jimerson* (1989), 127 Ill. 2d 12, 57 (Clark, J., dissenting).) This admission, however, was made after defendant's trial.

ment, pointing out the apparent inconsistency of Gray's continued incarceration. In the final analysis, however, the jury had before it Gray's consistent grand jury testimony, given at a time when she had no real or discernible motive to lie. We are not prepared to say then that a presentation of the State's discovery response would have resulted in a different verdict.

Defendant's third claimed instance of counsel's ineffectiveness concerns counsel's rejection of an instruction enabling the jury to consider Gray's and McCraney's prior inconsistent statements as substantive evidence pursuant to section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1).

In *People v. Jimerson* (1989), 127 Ill. 2d 12, 34, this court held that defense counsel's decision not to make substantive use of any of Gray's prior inconsistent statements was proper because such statements would not have provided any greater benefit as substantive evidence than as impeachment.

In the case before us, defense counsel introduced the entirety of Gray's testimony at the 1978 preliminary hearing as substantive evidence. That testimony consisted of Gray's statements that defendant was innocent and had raped no one, she did not know anything, nor had she heard anything, and the authorities had "made" her lie. Gray also stated at least 40 times in response to cross-examination using transcripts of her statements before the grand jury, "That's a lie."

During the subsequent conference on jury instructions, however, defense counsel submitted an instruction (Illinois Pattern Jury Instructions, Criminal, No. 3.11 (2d ed. 1981)) which permits a jury to consider prior inconsistent statements only for the purpose of determining the credibility of the witness. The trial court reminded defense counsel of the existence of section 115—10.1,

and counsel indicated that he was aware of it, but did not want any jury instruction on the issue. The court considered whether it should offer the instruction *sua sponte*, but declined to do so, since both parties seemed familiar with the law.

Based upon this record, and our decision in *Jimerson*, we conclude that confidence in the outcome of trial is not undermined by defense counsel's performance in this regard. Gray's flat and unembellished charge that defendant was innocent, given its context, cannot be viewed as anything but substantively weak, even if defendant's innocence was the ultimate issue in the case. Gray's simple statement of defendant's innocence was contradicted by her more detailed trial testimony recounting the events of the crime, which details were substantially unimpeached and further corroborated by forensic evidence and McCraney's testimony. Moreover, her claim of defendant's innocence was rejected by the jury in her own case, and apparently by the sentencing jury at defendant's first trial. Unlike *People v. Wilson* (1986), 149 Ill. App. 3d 1075, cited by defendant, defendant here was not deprived of evidence of an essential element of his defense because of the lack of proper instruction.

Similarly, the substantive value of McCraney's prior inconsistent statements when viewed in context was also not great. At trial, defense counsel cross-examined McCraney concerning his prior inconsistent statements that: (1) he saw the defendants enter the abandoned building at "about 2:15 or 2:30 [a.m.]"; and (2) he was able to gauge when defendant's car left Hammond Lane and appeared in the courtyard area in front of his apartment because he "went through" the 45 minute song he was composing once after "Kojak" ended and "was on it again." Defendant contends that if the jurors had been permitted to consider McCraney's statements substan-

tively in light of the additional testimony that the victims were seen by friends as late as 2:10 to 2:15 a.m., and the stipulated evidence that "Kojak" ended at 1:51 a.m. Eastern Standard Time, they might have concluded the impossibility of the State's case. When viewed in context, however, the substantive value of McCraney's prior inconsistencies was not great.

McCraney's first inconsistent statement was internally inconsistent with his later statement, during the same hearing, that he had last seen the defendants in front of his house at 2:30 or 2:45 a.m. During trial below, in fact, McCraney testified that his inconsistent statement of 2:15 a.m. was in error. Even if viewed as substantive evidence, the jury would have to consider this statement's context and that context necessarily diminishes its weight. McCraney's second inconsistent statement suffers accordingly as well. Because it is not at extreme variance with McCraney's trial statement that he was playing his 45-minute song during "Kojak," was being interrupted, and continued to play it after the program ended, we cannot say that the inconsistency carried significant substantive weight. Again, context is often determinative and here, because McCraney has acknowledged that he testified to time "roughly" and demonstrated that he was not specific, McCraney's prior statement could not realistically be viewed by a jury as an extremely accurate measure of time. Thus, we fail to see how a substantive consideration of McCraney's inconsistent statements would have resulted in a different verdict.

Defendant also contends that defense counsel's assistance was ineffective because counsel did not impeach McCraney with his prior statement given to *Chicago Lawyer* editor, Robert Warden, and later published in the newspaper. According to a letter of Warden addressed to defendant, some time prior to July 1982, War-

den went to McCraney's relocated residence and questioned him regarding the manner in which he had approximated the time of his sighting of defendant and defendant's car in the front of his apartment. Warden's letter states that McCraney said that his song lasted 45 minutes and that he played through it once and had started to play through it again when he looked outside, saw defendant, his car and several other persons. Warden also stated that he advised McCraney that television program logs indicated that "Kojak" had ended at 12:50 a.m. and that there were witnesses who could testify that the victims were at the service station at "2:30 a.m. *or later*." (Emphasis added.) According to Warden, McCraney said, "[W]ell, maybe them folks is innocent."

The test of whether a prior statement is sufficiently inconsistent to permit its utilization is that the statement have a reasonable tendency to discredit the direct testimony on a material matter. (*People v. Castro* (1982), 109 Ill. App. 3d 561, 566, quoting *People v. Burgin* (1979), 74 Ill. App. 3d 58, 73.) Materiality lies within the discretion of the trial court. (*People v. Svoboda* (1979), 75 Ill. App. 3d 487, 489.) The definition of inconsistency does not require a direct contradiction, but only a tendency to contradict the witness' present testimony. (*People v. Davis* (1982), 106 Ill. App. 3d 260, 263-64.) This determination is within the broad discretion of the trial judge. (*United States v. Thompson* (8th Cir. 1983), 708 F.2d 1294, 1302.) Thus, McCraney's prior statement would likely have been considered admissible since it was inconsistent with his trial testimony.

However, in our view defense counsel exercised sound trial strategy by not attempting to impeach McCraney with this statement. The predicates for McCraney's statement could certainly be viewed by defense counsel as unclear and problematic. Warden's letter itself demonstrates that McCraney's statement may have been made

in response to less than accurate information which Warden provided. Certainly too, defense counsel was amply aware that the *Chicago Lawyer* maintained (and quite rightly so) a nonobjective perspective in these matters as demonstrated by the record. In sum, we feel confident in indulging the presumption that defense counsel properly exercised his professional judgment in this area.

The next instance of ineffectiveness defendant alleges formed the basis for his *pro se* post-trial motion, an alleged failure to investigate 11 potentially exculpatory witnesses. The failure to interview witnesses may indicate actual incompetence (*People v. Greer* (1980), 79 Ill. 2d 103, 123, citing *People v. Witherspoon* (1973), 55 Ill. 2d 18), particularly when the witnesses are known to trial counsel and their testimony may be exonerating (*People v. Stepheny* (1970), 46 Ill. 2d 153). However, incompetence is not indicated where defendant can point to no potentially favorable testimony the witnesses might offer (*Greer*, 79 Ill. 2d at 123), or testimony which effect is not cumulative (*People v. Williams* (1976), 63 Ill. 2d 371, 374).

In this case, two of the witnesses defendant mentions actually testified at trial, McCraney and Clemente Morales, the manager of the Clark service station. One of the witnesses, Rene Brown, a private investigator, was appointed by the trial court in February 1986, to assist defense counsel in investigating the case. Brown had earlier been appointed in the same capacity to assist defendant's first defense counsel. Defendant cannot seriously contend that defense counsel failed to investigate these individuals. Clearly, also, any testimony which one of the other witnesses, a CBS program log manager, and Margaret Roberts, a *Chicago Lawyer* reporter, might offer would be cumulative since the parties stipulated as to when "Kojak" aired, and Roberts could only testify that Gray told her that defendant was innocent and the au-

thorities "made" Gray lie. With respect to Robert Warden, a *Chicago Lawyer* reporter, the record demonstrates that Warden's position was known to defense counsel. As such, defense counsel could reasonably believe that Warden's ability to impeach McCraney was limited, given the circumstances of their interview together, and Warden's obvious position on the matter.[2]

Likewise, defense counsel appears to have known of testimony Ron White, an attendant at another service station, might offer since counsel attempted to cross-examine Officer Capelli about White's alleged conversation with Lionberg at 2:30 a.m., before Lionberg's disappearance, but a prosecution objection was sustained. It is also reasonable for defense counsel to have assumed, solely based upon the information contained in defendant's letter, that Walter Salley, the apartment complex's janitor, and Tom Gallo, another private investigator, could neither add relevant information nor impeach any other witnesses' trial testimony. Further, it is also apparent that any investigation of "Helen," the wife of a witness who testified against defendant at his first trial, to refute her husband's charges that defendant committed an unrelated offense, would be pointless.

Similarly, any continued investigation to procure Dennis Johnson, an alleged witness to the crimes, would certainly prove fruitless. Since defendant's appellate

---

[2]The record reflects that during recess of a pretrial hearing concerning the conduct of *voir dire*, Warden telephoned the trial court. According to the trial court, after Warden learned from a reporter present in the courtroom of the manner in which *voir dire* was to be conducted, Warden made certain requests of the court and advised that if his requests were not granted, a lawsuit would be filed which would seek to intervene. Defense counsel could, therefore, reasonably believe that Warden's testimony might prove more damaging rather than helpful.

counsel, Martin Carlson, testified during the sentencing phase that Johnson had information about the crime which Johnson had related to investigator Brown, it is fair to say that defense counsel was aware of Johnson's existence, but either could not locate him or could not induce him to testify. We cannot fault defense counsel for failing to pursue a witness who was apparently unavailable. We conclude that defense counsel adequately discharged his investigative responsibilities and cannot be faulted in this regard.

Defendant also claims several instances of ineffectiveness due to defense counsel's alleged failure to make certain objections: to the prosecution's closing argument that Gray had been convicted of perjury; to argument that the jury was constrained to convict, unless it found that police had "framed" defendant; and to the introduction of evidence of the victims' personal traits and argument thereof. The record shows, however, that it was co-defense counsel, Scott, who first argued that Gray had been convicted of perjury. Clearly also, defense counsel's strategy throughout trial and during closing argument was premised upon this view of Gray as a liar. It was apparently defense counsel's quite reasonable decision that more was to be gained by portraying Gray in this manner than by arguing her veracity. Additionally, the evidence of the victims' personal traits was admitted for legitimate purposes of identification, and to demonstrate the course of police investigation. Moreover, it is clearly a matter of trial strategy for counsel to refrain from objecting to life-and-death testimony. (See *People v. Lewis* (1981), 88 Ill. 2d 129, 155.) In sum, we do not find that any of these alleged failures, even assuming that they amounted to ineffectiveness, would have decisively affected the outcome at trial. We find no prejudiced result on these bases.

Defendant also contends that defense counsel failed to pursue potentially exculpatory scientific testing. Defendant's argument is premised upon the defense expert's reported finding that defendant was a "nonsecretor" and that Rainge was also probably a "nonsecretor." While this report revealed that Jimerson and Adams were "secretors," it also demonstrated that, qualitatively, only Adams could have been responsible for the blood Type A indicators found on the vaginal swab taken from Schmal's body. The report recommended the conducting of further qualitative tests on all the defendants' blood samples and on the vaginal swab to determine whether Adams could be eliminated. The recommended test would compare the composition of Adams' blood and saliva samples to the composition of secretions found on the vaginal swab.

The record clearly demonstrates, however, that at the time these tests were suggested the deteriorated condition of the vaginal swab precluded any definitive scientific result. The vaginal swab had possibly been exposed to the perspiration of various handlers, and this fact was discussed in open court several months prior to trial. Furthermore, tests conducted immediately before trial confirmed these earlier expressed concerns. Clearly, the integrity of the swab was open to question. Accordingly, we cannot find fault with defense counsel for not undertaking additional tests.

Defendant's further contention is that defense counsel's performance was flawed because he failed to request a more specific *voir dire* of jurors to uncover potential racial bias. *Turner v. Murray* (1986), 476 U.S. 28, 36-37, 90 L. Ed. 2d 27, 37, 106 S. Ct. 1683, 1688, holds "that a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias."

In the present case, the record reflects that, contrary to defendant's argument, defense counsel drafted and proposed two *voir dire* questions in an attempt to satisfy the requirements of *Turner v. Murray*. The trial court accepted defense counsel's first question, as it was substantially the same question as proposed by the defendant in *Turner* (Will the fact that defendant is black and victim is white prejudice you against defendant or affect your ability to render a fair and impartial verdict based solely on the evidence?). The trial court, however, rejected defense counsel's second question ("Have you had any previous contact with blacks that resulted in you harboring a bias or prejudice against blacks as a whole?"). This question clearly attempted to probe the issue of potential racial bias further. The trial court, however, did not find the second question of any greater assistance than the first in uncovering racial bias and allowed only the first question. Based on this record and the additional fact that defendant alleges no actual prejudice, we cannot say that ineffectiveness of counsel has been shown.

Finally, defendant argues defense counsel's responsibility for the timeliness of his jury sentencing waiver. The record shows that defendant waived jury sentencing following the guilt or innocence phase of his trial. He contends on appeal that defense counsel should have realized that conviction would necessitate a waiver of jury sentencing, and so, such waiver should have been accomplished before trial to avoid defendant from being tried by a "conviction prone" jury.

It is well established that a jury questioned regarding imposition of the death penalty is presumed to be a fair jury on the issue of guilt or innocence. (*Buchanan v. Kentucky* (1987), 483 U.S. 402, 414-15, 97 L. Ed. 2d 336, 350, 107 S. Ct. 2906, 2913; *People v. Erickson* (1987), 117 Ill. 2d 271, 292; *People v. Free* (1983), 94 Ill. 2d 378,

401.) Thus, in the present case, without more, defense counsel was not derelict in the performance of his duties, by allowing the jury to be death-qualified. It is also fair to say that defense counsel's decision as to whether jury sentencing was to be waived was purely a matter of trial strategy. Furthermore, there is no indication in the record that defendant did not concur in the decision to waive jury sentencing after trial.

In conclusion, no single instance cited by defendant as an example of defense counsel's ineffectiveness rises to that level. Neither do the described circumstances in the aggregate combine to produce such a result. This case is not comparable to *People v. Bell* (1987), 152 Ill. App. 3d 1007, as a sheer multiplicity of allegations does not translate into error. We believe that defense counsel's assistance has not been demonstrated by this record to have been ineffective.

Related to defendant's ineffective-assistance claim is his contention that he was denied the right to a fair trial because of the trial court's failure to appoint new counsel to argue his *pro se* motion for a new trial. For support, defendant relies upon our decision in *People v. Krankel* (1984), 102 Ill. 2d 181, 189.

In *Krankel*, following defense counsel's failure to present any evidence at trial, defendant presented a *pro se* motion alleging ineffective assistance of counsel based upon counsel's failure to present an alibi defense or to contact an alibi witness suggested by the defendant. Upon agreement of the appellate counsel for the State and the defendant that counsel should have been appointed to represent defendant on his motion, we remanded for a new hearing on the motion with new appointed counsel.

We have recently approved the appellate court's interpretation of our holding in *Krankel*. (See *People v. Nitz* (1991), 143 Ill. 2d 82.) A *pro se* motion for a new trial

alleging ineffective assistance of counsel does not *per se* require appointment of new counsel to assist in the motion irrespective of the basis of the motion and in the absence of a request for new counsel. (See *People v. Washington* (1989), 184 Ill. App. 3d 703, 711; *People v. Mallette* (1985), 131 Ill. App. 3d 67, 75; *People v. Jackson* (1985), 131 Ill. App. 3d 128, 138-39.) Rather, "the trial court should examine the factual matters underlying the defendant's claim, and, if the claim lacks merit or pertains to matters of trial strategy, then no new counsel need be appointed. Only if the allegations show possible neglect of the case *** should new counsel be appointed." *Washington*, 184 Ill. App. 3d at 711, quoted in *Nitz*, 143 Ill. 2d at 134.

The record in the present case shows that following the guilt or innocence phase, defendant filed a written *pro se* motion for a new trial alleging, *inter alia*, the ineffectiveness of defense counsel. In substance, defendant alleged that defense counsel was ineffective in that he: refused to call defense witnesses such as Warden, Brown and Roberts; was tardy concerning procedural matters; did not provide defendant discovery materials to participate in the defense; called defendant names because he disagreed with counsel's "trial strategy and omission of vital witnesses." Defendant also alleged that Rene Brown would testify that defense counsel had never called him to testify, despite that Brown was a pertinent witness who had uncovered "startling" evidence. In support of the motion, defendant attached several documents: two letters from defendant addressed to defense counsel including a list of potential witnesses (discussed elsewhere in this opinion); a serology report of the defendants' blood samples; and letters of Warden and Roberts. Defendant did not request that new counsel be appointed to argue his motion.

Defense counsel filed a separate written post-trial motion for a new trial which made no mention of defendant's ineffectiveness claim. The trial court subsequently held a hearing on both motions, and following argument, denied defense counsel's motion. After stating that he had fully read defendant's *pro se* motion and familiarized himself with "each and every one" of its attachments, the trial court invited the State's response. The State essentially argued that defendant's allegations concerned matters of trial strategy. Defense counsel did not comment, nor did the trial court question him. Following the State's arguments, the trial court denied defendant's motion, ruling that, having experienced trial of the matter, the alleged examples of ineffectiveness unquestionably concerned trial tactics and strategies. The court added that defense counsel had provided defendant with more than competent legal representation throughout trial. At a later point in the hearing, the court became aware that defendant also wished to comment and so allowed defendant to further argue the motion.

In our view, the trial court conducted the necessary examination of the factual matters underlying defendant's claim. (See *People v. Jackson* (1985), 131 Ill. App. 3d 128, 139; *People v. Jackson* (1987), 158 Ill. App. 3d 394, 401.) The trial court's determination was based upon its knowledge of defense counsel's performance at trial and the insufficiency of defendant's allegations on their face. (See *People v. Washington*, 184 Ill. App. 3d at 711.) Furthermore, defendant's additional argument on the motion provided no basis upon which the trial court could decide otherwise.

Defendant argues, however, that the trial court's examination did not meet a so-called "objective test" established in *Jackson*, 158 Ill. App. 3d at 401, and *People v. Johnson* (1981), 98 Ill. App. 3d 228, 230-32, because the trial court did not engage in an interchange with de-

fense counsel before deciding the motion. Yet, "[s]uch an interchange is necessary to avoid potential abuses by those who would falsely claim situations of the *Krankel* type." (*Jackson*, 131 Ill. App. 3d at 139.) We fail to see how defendant can claim prejudice on this basis, since apparently neither defense counsel nor the trial court felt such an interchange was necessary to enable counsel to rebut defendant's charges. Consequently, since the trial court conducted a proper examination of the factual bases for defendant's claims, finding them meritless, and defendant's allegations revealed no possible neglect, new counsel need not have been appointed. Moreover, defendant's claim was not so well supported to have entitled him to an evidentiary hearing concerning ineffectiveness of counsel, even with the representation of his then current defense counsel.

### The Failure to Provide a Trial Transcript

Defendant next contends that the trial court should have provided him with a "full, complete and unabridged transcript" of proceedings before requiring the filing of a motion for a new trial.

The record shows that at the conclusion of trial, on February 13, 1987, the trial court granted defendant a continuance of sentencing until March 3, 1987. On February 25, 1987, defendant filed a motion requesting a "full, complete and unabridged" transcript of all proceedings, and arguments were held that same day. The State opposed the motion, arguing that defense counsel had been provided transcripts of the two principal witnesses' testimonies. Defense counsel, himself, acknowledged receipt of those transcripts. The trial court withheld ruling on the motion, stating that it would not delay the sentencing hearing in order that defense counsel could obtain the requested transcript. Defense counsel, however, might renew the motion if the need arose.

On March 4, 1987, defense counsel renewed the motion; however, the trial court denied the request for a "full, complete, and unabridged transcript," but told counsel that he was entitled to the transcripts from trial.

On April 16, 1987, defendant's motion for a new trial was filed and argued. Defense counsel did not indicate that he did not have the benefit of the trial transcript in preparing the motion. Of significance is the fact that defendant's motion included all of the issues defendant raises on this appeal with the exception of claims of counsel's ineffectiveness and prosecutorial misconduct in closing argument.

Since we consider those issues and do not invoke the doctrine of waiver in that regard, defendant has not been prejudiced, even assuming that he did not have the benefit of a transcript. Furthermore, we are unaware of authority that supports the notion that a defendant has a right to a full, complete, and unabridged transcript before the filing of a motion for a new trial. Those authorities cited by defendant do not support the proposition. Yet, defendant additionally claims that because he was not provided such a transcript, his ability to show ineffectiveness of counsel at the hearing on such *pro se* posttrial motion was undercut. We disagree.

We have reviewed the argument which defendant personally made during the hearing on his *pro se* ineffectiveness motion. Not one argument is dependent upon specific testimony, or pretrial or trial proceedings. Defendant, for example, argued that Gray and McCraney had perjured themselves at trial, and that he knew so as "a fact." Defendant stated, however, that he could not prove that fact unless a hearing was held. Similarly, defendant claimed that persons who had never testified, Warden, Sally, and Dr. Blake, possessed exculpatory information. Obviously, a showing of such claims did not depend upon securing a full, complete and unabridged

transcript. Thus, we find defendant's contentions merit-less.

## Prosecutorial Abuse of Discretion

Defendant charges that the State's Attorney abused his prosecutorial discretion by failing to investigate available information implicating other persons in these crimes. According to defendant, this information concerned admissions by a certain Dennis Johnson.

Attorney Martin Carlson, defendant's former appellate attorney, testified in defendant's behalf at the hearing in aggravation and mitigation. Carlson testified that in 1980 he spoke with Dennis Johnson concerning the case, in the presence of Rene Brown. Five years later, Carlson prepared an affidavit based upon notes and his memory. The affidavit was read into the record.

According to the affidavit, Johnson told Carlson that he knew the "real" perpetrators responsible for the crimes, and that one such person was a close friend whose name Johnson would not disclose. Johnson claimed to have knowledge concerning the actual perpetrators and said that he would consider having one of those persons speak with Brown.

Upon cross-examination, Carlson acknowledged that his notes indicated that Brown had met with Johnson's unidentified friend and that Brown had related that the person "virtually" admitted he shot Schmal. Brown, however, would not tell Carlson this person's name, wanting to employ his own approach to the investigation and Carlson agreed. Carlson also admitted that he had spoken to defense counsel on several occasions, but did not tell him that Brown knew the name of the killer. Neither did Carlson contact the police or the State's Attorney's office upon learning that Brown possessed this knowledge.

A letter which defendant had written to the prosecutors after his death penalty hearing was also made a part of the record. In the letter, defendant requested that the prosecutors reopen their investigation and "recall the prosecution" inasmuch as Johnson had information implicating other persons. Defendant also referred to Warden and Roberts' article in the *Chicago Lawyer* which indicated that others had committed the crimes. During the hearing's closing argument, defense counsel again referred to the Dennis Johnson information and said that it had been known for some time prior to trial.

The State's Attorney has the responsibility of evaluating evidence and other pertinent factors and determining what, if any, offense may be charged. (*People v. Rhodes* (1967), 38 Ill. 2d 389, 396.) The prosecutor is vested with wide discretion in enforcing the criminal laws. (*Marcisz v. Marcisz* (1976), 65 Ill. 2d 206, 210.) However, it is the State's Attorney's duty to see that "justice is done not only to the public at large but to the accused as well." (*People v. Pohl* (1964), 47 Ill. App. 2d 232, 241-43.) ABA Standards further provide that the "prosecutor, as the chief law enforcement official of his jurisdiction, ordinarily relies on police and other investigative agencies for investigation of alleged criminal acts, but he has an affirmative responsibility to investigate suspected illegal activity when it is not adequately dealt with by other agencies." ABA Standard 3—3.1(a) (1980). See also *Ware v. Carey* (1979), 75 Ill. App. 3d 906, 914.

Based upon the record before us, and these several considerations, we fail to see how the State's Attorney abused his discretion in this case. The record is silent as to whether the Dennis Johnson lead was ever investigated by the State. Since the information was apparently known to even the media prior to defendant's trial, if any assumptions are to be made, it seems more reasonable to assume that such a lead was investigated.

Furthermore, it is apparent from the testimony of Carlson that such a lead was never considered worthy of pursuit even by the defense. We therefore decline to find that the State's Attorney abused his discretion in his conduct of the investigation.

Ineffective Assistance of Counsel During Sentencing

Defendant argues that defense counsel's performance during sentencing was deficient. First, defendant claims that defense counsel's presentation of certain witnesses was the substantive equivalent of presenting no mitigation witnesses.

"[T]he failure to offer evidence in mitigation does not, in and of itself, demonstrate incompetence. [Citations.]" *People v. Shum* (1987), 117 Ill. 2d 317, 370; *People v. Orange* (1988), 121 Ill. 2d 364, 389; see *Burger v. Kemp* (1987), 483 U.S. 776, 97 L. Ed. 2d 638, 107 S. Ct. 3114.

Even so, in the instant case, defense counsel presented Mary Alice Rankin, the associate director of the Illinois Coalition Against the Death Penalty, who testified that she visited defendant on a regular basis while he was on death row in 1979 and 1980. She had, however, stopped visiting him during the four previous years, but continued to correspond with him and talk to him by telephone. Rankin testified that defendant had become a "responsible, thoughtful mature adult," "held in high esteem" by others on death row, and possessing rehabilitative potential.

Mary Cummins, a caseworker with the Illinois Department of Public Aid, testified that she had known defendant for about two years, having visited him approximately 20 times, and having spoken with him by telephone in recent months perhaps two or three times a week. Cummins was able to observe that correctional personnel held defendant in high esteem based upon his

treatment of persons with respect, consideration, and courtesy. Cummins also testified that defendant possessed rehabilitative potential.

Attorney Carlson testified by reference to the affidavit he had prepared some years previously, that he had interviewed Dennis Johnson in the presence of investigator Rene Brown. Carlson testified that Johnson had implicated persons other than defendants, personally knew such persons, and that Brown had subsequently met with one of them, but declined to reveal that person's identity.

Based upon this review, we simply fail to see how defendant can claim that such evidence lacked mitigating value. Moreover, the record contains no indications of what other mitigating evidence defense counsel could have introduced or argued. (See *People v. Orange*, 121 Ill. 2d at 389-90.) Neither is defendant able to point to any possible evidence *dehors* the record which might have been offered. The situation here is not comparable to that in *United States ex rel. Kubat v. Thieret* (N.D. Ill. 1988), 679 F. Supp. 788, cited by defendant, where 15 nonrelative witnesses testified for the defense during a post-conviction hearing and had been prepared to testify concerning mitigating evidence, if defense counsel had called them. Thus, there is no showing here that defense counsel, who was an experienced trial attorney, failed to present mitigating evidence, or alternatively, that evidence existed which counsel did not present. Consequently, we find defendant's ineffectiveness argument insupportable on this score.

Secondly, defendant claims that defense counsel's ineffectiveness was evidenced by his waiver of an opening statement and the allegedly insubstantial nature of his closing argument. This contention is equally lacking in merit.

"[The] [m]aking or waiving [of] an opening statement in behalf of a defendant is a question of judgment in strategy and if a defense attorney chooses to forego making an opening statement it certainly cannot be said to reflect want of professional competence." (*People v. Georgev* (1967), 38 Ill. 2d 165, 169.) Considering that any argument would have been to the trial court rather than to a jury, we cannot say that waiver indicated incompetence.

At closing argument, the State successively disputed each possible statutory mitigating factor. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.1.) We believe that defense counsel, in response, chose to rely, quite reasonably, upon a strategy focusing the trial court's attention on a single, nonstatutory mitigating factor, residual doubt, created by Carlson's testimony. Furthermore, there is no indication in the record before us that a more concentrated, intense argument of the evidence presented by Rankin's or Cummins' testimonies would have precluded imposition of the death sentence.

We direct our attention to the third basis of defendant's ineffectiveness claim, an alleged failure to meaningfully attack the State's aggravation evidence. Defendant contends that defense counsel failed in this regard by not obtaining materials before sentencing which pertained to the defendant's alleged participation in a disturbance at the Stateville prison, and not being prepared for cross-examination. To avoid repetition, we will review facts pertinent to resolution of this issue as well as a related issue which follows.

During pretrial, defense counsel filed a "motion for discovery and a bill of particulars as to aggravation." The motion requested that the State disclose the names of all witnesses expected to testify in aggravation, and regarding their testimony, "relevant police reports, statements, 'rap sheets', etc." Defense counsel also filed

a motion to compel the State to disclose any nonstatutory aggravating factors to be presented at sentencing. At a later hearing on the motions, the trial court ordered the State to make written disclosure, at some point prior to sentencing, of witnesses and evidence it intended to present in aggravation. Defense counsel was also expressly noticed that evidence in aggravation presented at defendant's first sentencing hearing might be offered by the State again at sentencing.

Shortly thereafter, the State filed its list of potential sentencing witnesses, which incorporated by reference all trial witnesses and included numerous unidentified Illinois Department of Corrections (IDOC) personnel. Nonstatutory aggravating factors were listed as defendant's prior convictions and conduct while imprisoned within the IDOC. The State represented that it was in the process of obtaining defendant's IDOC file and once the file was reviewed, the identities of IDOC witnesses would be provided. No other potential witnesses were expected to be presented.

On July 25, 1986, the State filed a "Supplemental List of Witnesses for Potential Sentencing Hearing," which identified 48 persons from IDOC, the Illinois State Police, and the Will County's sheriff's department.

During sentencing, defense counsel renewed his prior discovery request for "police reports, statements," etc. Defense counsel maintained that he had not received copies of documents that might form the basis for the potential witnesses' testimonies. In response, the State acknowledged that it had defendant's entire IDOC file which had just been supplemented the previous week with pertinent documents (comprising less than 50 pages), upon which it intended to rely. Defense counsel was offered the opportunity to view the materials. The trial court subsequently ruled, however, that the State had fully complied with due process requirements per-

taining to sentencing. It noted that it had conducted a prior *in camera* inspection of voluminous materials received from Margaret Roberts, which included a substantial amount of information concerning defendant's incarceration, so that defense counsel could not claim surprise in terms of substance.

Direct examination of the State's witness Larry Stigler, a correctional officer, followed. Stigler testified that defendant participated in a prison disturbance in which Stigler had been held hostage. During cross-examination, Stigler admitted that he testified in reliance upon a written statement that he had previously prepared, and that the State had the statement in court. After the statement was tendered to defense counsel, counsel renewed his motion requesting any witness' statements in the State's possession. The trial court then granted defense counsel a brief recess to review such materials. Following continued objection by defense counsel, the trial court allowed counsel 1½ hours to "peruse" the materials for information and to prepare for continued cross-examination.

During the continued cross-examination of Stigler, defense counsel introduced into evidence reports prepared by Stigler. Stigler admitted that the reports did not include information indicative of defendant's aggressiveness during the disturbance. Richard DeRobertis, an assistant warden, also testified. Defense counsel impeached DeRobertis' testimony by introducing his report of the prison disturbance.

The trial court then recessed for a lengthy period of time to enable defense counsel to review additional material (30 pages) from defendant's IDOC file in preparation for the examination of George Welborn, a former assistant warden at the Stateville prison. Just prior to Welborn's cross-examination, defense counsel objected, stating that he had been afforded a "woefully insuffi-

cient" period of time to prepare. In response, the State offered that should defense counsel, following cross-examination, find useful information in the file it would stipulate to the information's existence and a review by the sentencing court. Following Welborn's cross-examination, defense counsel was given possession of defendant's IDOC file overnight.

During cross-examination, defense counsel specifically referred Welborn to information within defendant's IDOC file. Welborn was impeached regarding his previous testimony, and also impeached DeRobertis' testimony. Welborn further acknowledged that reports indicated information reflecting favorably on defendant. At no time did defense counsel request stipulations concerning additionally discovered favorable information.

Based upon our extensive review of the record, we do not find that defense counsel's performance was deficient under the circumstances. This case is not comparable to *United States v. Hinton* (D.C. Cir. 1980), 631 F.2d 769, cited by defendant, because defense counsel here vigorously objected to the last-minute production of materials, and received several lengthy recesses to review materials.

Furthermore, despite short notice and time constraints, defense counsel managed to effectively cross-examine the State's witnesses regarding defendant's alleged role in the prison disturbance. True, defense counsel might have obtained the witnesses' statements regarding the Stateville incident by subpoena prior to the sentencing hearing, but counsel had already requested the production of these materials, and none were supplied, or indicated to exist, until the time of the hearing. It is also apparent that defense counsel had prior knowledge of some details concerning the prison disturbance. We cannot fault defense counsel for failing to present all evidence with possible impeachment value,

as suggested by defendant's reference to *People v. Paliemar* (1985), 132 Ill. App. 3d 830 (codefendant acquitted of charges arising from prison disturbance).

Moreover, even assuming that defense counsel's performance was deficient under these circumstances, we do not believe that to a "reasonable probability" it was outcome-determinative. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) Defendant was a twice-convicted felon who murdered two persons while on parole for a previous offense. One of those deaths occurred during the course of a felony rape. No statutory mitigating factors existed. Nonstatutory mitigating factors were perhaps evenly balanced against the State's nonstatutory aggravating factors. Thus, defendant's ineffectiveness claim fails on this third basis as well.

Defendant's last argument regarding claimed ineffectiveness at the sentencing phase concerns defense counsel's remarks during the guilt or innocence phase that the crimes were "brutal" and "most heinous," justifying community "outrage." Defendant claims that these remarks are evidence of defense counsel's alleged surrender at sentencing. We disagree.

An evaluation of defense counsel's conduct cannot extend into areas involving the exercise of professional judgment, discretion or trial tactics. (*People v. Franklin* (1990), 135 Ill. 2d 78, 118; *People v. Mitchell* (1984), 105 Ill. 2d 1, 12.) In the instant case, it is obvious that defense counsel's remarks were made to diffuse the impact of the crimes. By defense counsel's admission of the horrendous nature of the crimes, that nature became a nonissue. Hopefully, the jury could then focus upon the crux of the case, whether the responsible party was in fact before them. Accordingly, we cannot say that defense counsel's remarks represented anything other than sound trial strategy.

### Denial of Additional Discovery of Aggravation Evidence

Defendant presents an argument which is converse to his previous claim that defense counsel was ineffective by failing to meaningfully attack the State's aggravation evidence. Defendant maintains that the trial court erred by denying defendant's requests for further discovery of police reports and witness statements which the State intended to rely on in aggravation. We have previously considered the record at length as it pertains to this issue.

Our decision in *People v. Foster* (1987), 119 Ill. 2d 69, 101-03, is controlling on this issue. In *Foster*, we held that discovery is not constitutionally required at the sentencing phase. We reasoned that a defendant, at sentencing, "has already been convicted and, therefore, is 'entitled to fewer procedural safeguards than one who has not been convicted at all.' " (*People v. Foster*, 119 Ill. 2d at 102, quoting *People v. DeWitt* (1979), 78 Ill. 2d 82, 85; *Gagnon v. Scarpelli* (1973), 411 U.S. 778, 789, 36 L. Ed. 2d 656, 665-66, 93 S. Ct. 1756, 1763.) Furthermore, admissibility of evidence at the aggravation and mitigation phase of sentencing is not governed by the restrictive rules of evidence in effect at the guilt stage. Defendant's contention in the present case, accordingly, is unfounded.

### Constitutionality of the Illinois Death Penalty Statute

Defendant challenges the Illinois death penalty statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d)) on several bases. Defendant first charges that the provision invests prosecutors with unguided discretion to choose which defendants shall be subject to the death penalty, leading to the arbitrary and capricious imposition of death in violation of the eighth amendment (U.S. Const., amend. VIII).

In *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, we held that section 9—1(d) of the Criminal Code of 1961 did not violate the eighth amendment and the due process clause, or abridge separation of powers because of the discretion afforded the prosecution. (See also *People v. Lewis* (1981), 88 Ill. 2d 129.) We found that under section 9—1(d), while the prosecution's decision to seek a death penalty hearing was discretionary, nonetheless, such discretion was exercised dependent upon whether the requisite elements for death sentencing exist. Prosecutorial discretion is further guided because this evaluative decision is made at the conclusion of trial.

Most recently, the Seventh Circuit in *Silagy v. Peters* (7th Cir. 1990), 905 F.2d 986, *cert. denied* (1991), 498 U.S. 1110, 112 L. Ed. 2d 1106, 111 S. Ct. 1024, held that the fact that section 9—1(d) does not provide guidelines to assist the exercise of prosecutorial discretion does not implicate eighth amendment concerns. The court found that the prosecutor's decision to seek the death penalty was necessarily guided by his assessment of the possibility of proving a specific element of the crime beyond a reasonable doubt. Such a decision was substantially the same decision presented to the prosecutor in *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909, where the Georgia death penalty statute was upheld. In neither instance did the exercise of prosecutorial discretion fall within that category of "sentencing discretion" which the Supreme Court has said must be narrowly channeled to minimize the risk of arbitrariness and capriciousness. *Furman v. Georgia* (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726.

"A prosecutor's decision under section 9—1(d) of the Illinois statute to commence or forgo a death sentence hearing is not a decision to 'impose' the death sentence." (*Silagy*, 905 F.2d at 993.) Under the statute, rather, the prosecutor's role is limited to that of initiat-

ing the proceedings; the judge or the jury, in the exercise of their discretion, actually imposes the sentence. Accordingly, we decline to reconsider our previous holdings.

Defendant next argues that section 9—1(c) has been construed by this court as disallowing the trier of fact from considering "sympathies or prejudices that may exist" in violation of both the eighth and fourteenth amendments (U.S. Const., amends. VIII, XIV). (See *People v. Morgan* (1986), 112 Ill. 2d 111, 146.) Relying upon *California v. Brown* (1987), 479 U.S. 538, 93 L. Ed. 2d 934, 107 S. Ct. 837, defendant maintains that such construal has been rejected as violative of constitutional rights. (See also *Caldwell v. Mississippi* (1985), 472 U.S. 320, 331, 86 L. Ed. 2d 231, 240-41, 105 S. Ct. 2633, 2640-41.) *Brown* stands for the proposition that "mere sympathy," "the sort of sympathy that would be totally divorced from the evidence," is irrelevant in a death penalty proceeding. (*Brown*, 479 U.S. at 542, 93 L. Ed. 2d at 940, 107 S. Ct. at 840.) We have recently held that it is exactly that "gut" reaction to aggravating or mitigating evidence ("mere sympathy") to which our construal of section 9—1(c) speaks. (See *People v. Spreitzer* (1988), 123 Ill. 2d 1, 42-43; accord *Saffle v. Parks* (1990), 494 U.S. 484, 108 L. Ed. 2d 415, 110 S. Ct. 1257.) Again, we decline to overrule our prior decisions in this matter.

Defendant's third argument is a general attack upon the death penalty statute's alleged failure to adequately safeguard against arbitrary and capricious imposition of death sentences. Defendant urges that we reconsider our previous holdings that the breadth of prosecutorial discretion is appropriate (*People v. Albanese* (1984), 104 Ill. 2d 504; *People v. Eddmonds* (1984), 101 Ill. 2d 44), and that no burden of proof is imposed on either party at the aggravation and mitigation phase of a death penalty

hearing (*People v. Jones* (1982), 94 Ill. 2d 275; *People v. Gacy* (1984), 103 Ill. 2d 1). Inasmuch as defendant has not raised any novel or compelling reasons to support his argument, we decline to reconsider the issue at this juncture.

Next, defendant maintains that the death penalty statute violates due process and equal protection inasmuch as it fails to adequately narrow to a unique and cognizable group those persons eligible for death from others found guilty of murder. Defendant argues that there exists no real distinction between the type of murder for which a conviction must be returned, or in the type of aggravating factor which must be found under the death penalty statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)), as compared to the life imprisonment statute under the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)). According to defendant, no "meaningful distinction" therefore exists between the two categories of defendants. See *Godfrey v. Georgia* (1980), 446 U.S. 420, 64 L. Ed. 2d 398, 100 S. Ct. 1759; see also *Zant v. Stephens* (1983), 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733.

In *People v. Olinger* (1986), 112 Ill. 2d 324, 352, this court held that its decision in *People v. Brownell* (1980), 79 Ill. 2d 508, 533-34, was dispositive of this issue. In *Brownell*, we discussed the balancing process which operates during death sentencing under sections 9—1(b) and (f) of the Criminal Code (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(b), (f)), which may be preliminary to life imprisonment sentencing. Under these sections, once the State has proved the existence of any of the aggravating factors beyond a reasonable doubt, a unanimous jury or the court must weigh the mitigating factors against the aggravating factors and conclude that no mitigating factors sufficiently preclude the imposition of the death sentence. It is this process, in conjunction with the require-

ment of proof beyond reasonable doubt of any aggravating factor, as well as mandatory review (134 Ill. 2d R. 603), which sufficiently circumscribes the class or persons eligible for the death penalty. "What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime." (*Zant v. Stephens*, 462 U.S. at 879, 77 L. Ed. 2d at 251, 103 S. Ct. at 2743-44.) The Illinois death penalty scheme accomplishes that result and therefore passes constitutional muster on this basis.

Defendant also challenges the death penalty statute on the alleged basis that available evidence indicates that it is applied in a racially discriminatory manner. In support, defendant cites Murphy, *Application of the Death Penalty in Cook County*, 73 Ill. B.J. 90 (1984). We continue, however, to adhere to the views which we expressed in *People v. Davis* (1987), 119 Ill. 2d 61, 66-68. The authority defendant presents fails to "demonstrate a constitutionally significant risk of racial bias" affecting our statutory death penalty scheme. See *McCleskey v. Kemp* (1987), 481 U.S. 279, 313, 95 L. Ed. 2d 262, 292, 107 S. Ct. 1756, 1778.

Defendant's final argument is that the death penalty statute is unconstitutional in that it places a burden of persuasion upon the defendant to prove that death should not be imposed. Under sections 9—1(g) and (h), at stage two of the death penalty sentencing hearing, the State, as movant, attempts to show that the defendant should receive the death sentence by establishing that "there are no mitigating factors sufficient to preclude the imposition of the death sentence." (Ill. Rev. Stat. 1979, ch. 38, pars. 9—1(g), (h).) As we have previously held, the State has the burden of going forward with the evidence. (*People v. Williams* (1983), 97 Ill. 2d 252, 302-03; *People v. Ramirez* (1983), 98 Ill. 2d 439, 468-69; *Peo-*

*ple v. Del Vecchio* (1985), 105 Ill. 2d 414.) We decline to reconsider these decisions and, accordingly, reject defendant's final argument.

For the reasons we have stated, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, January 28, 1992, as the date on which the sentence of death entered by the circuit court is to be executed. The defendant shall be executed in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of the mandate in this case shall be delivered by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein defendant is confined.

*Judgment affirmed.*

JUSTICE CLARK, concurring:

I concur with the opinion of the court, but write separately to explain the differences between the instant case and *People v. Jimerson* (1989), 127 Ill. 2d 12.

Defendant was convicted and sentenced to death for his role in the same gang rape and double homicide for which Verneal Jimerson was convicted and sentenced to death in a separate trial. I dissented in *Jimerson*, stating I would have reversed the defendant's conviction because his counsel (1) failed to produce evidence that Paula Gray gave testimony, under oath, which exonerated Jimerson on four prior occasions; (2) failed to produce evidence that Gray was mentally retarded; and (3) did not offer Gray's prior inconsistent statements as substantive evidence. (*Jimerson*, 127 Ill. 2d at 57 (Clark, J., dissenting).) The evidence in *Jimerson* was closely balanced in light of the defects in Gray's testimony and the alibi evidence presented by Jimerson.

270

Although the two cases relate to the same crimes, I believe the instant case is distinguishable from *Jimerson*. The only evidence which linked Jimerson to the crimes was the testimony of Paula Gray. While Gray was the only occurrence witness to testify in this case, she was not the only witness to implicate Williams. Charles McCraney testified that on the night of the murders, he saw Williams enter the apartment building in which Carol Scmal's body was found. In addition, McCraney testified that on the day following the murders, he heard Williams make incriminating statements. McCraney also testified in *Jimerson*, but he was unable to place Jimerson at the scene of the crime. Further, unlike Jimerson, Williams did not offer any alibi evidence at his trial.

Based on these distinctions, the case against Williams is stronger than that against Jimerson, and therefore I concur with the majority opinion affirming defendant's conviction and sentence.